Tiffany **FENTERS,** Plaintiff,

v.

**YOSEMITE CHEVRON,
et al.,** Defendants.

**No. CV–F–05–1630 OWW/DLB.**

United States District Court,
E.D. California.

Dec. 30, 2010.

Order Denying Certification
April 7, 2010.

Kevin Gerard Little, Law Office of Kevin G. Little, Fresno, CA, for Plaintiff.

Cathy L. Arias, Andrew R. Shalauta, Andrew R. Shalauta, Burnham and Brown, Oakland, CA, James J. Arendt, Weakley, Arendt & McGuire, Joseph D. Rubin, Betts & Wright, Fresno, CA, James Nathan Fincher, Merced County Counsel, Merced, CA, for Defendants.

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS YOSEMITE CHEVRON, ABBCO INVESTMENTS, LLC, AND ROBERT ABBATE'S MOTION FOR SUMMARY JUDGMENT (Doc. 137)

OLIVER W. WANGER, District Judge.

Before the Court is the motion for summary judgment filed by Defendants Yosemite Chevron, Abbco Investments, LLC, and Robert Abbate (hereafter the "Abbate Defendants").[1]

## A. *ABBATE DEFENDANTS' OBJECTIONS TO BETTANCOURT EXPERT REPORT.*

■ Submitted in opposition to the Abbate Defendants' motion for summary

---

1. The motions for summary judgment filed by the County Defendants and the Cassabon Defendants will be resolved by separate memorandum decisions.

judgment is what is characterized by Mr. Little as "the declaration report" of John Bettancourt. Mr. Bettancourt avers:

1. I am a certified public accountant. My current curriculum vitae has been provided separately.

2. I have been retained on behalf of plaintiff Tiffany Fenters in this proceeding.

3. My opinions regarding the accounting aspects of this case are set forth in my testimony in the criminal case, *People v. Tiffany Fenters*, which I incorporate herein by reference. Those opinions remain unchanged. I based those opinions on a review of the accounting materials provided and made available by the prosecution in the underlying criminal case. I reviewed those materials at length, and I understand that my related work product has also been produced by plaintiff's counsel.

4. The spreadsheets provided by defendant Robert Abbate is indicative of false, fabricated and misleading work product for the reasons previously stated in my trial testimony and as reflected in my work product. The accounting work done by defendants Cassabon & Associates and Victor Fung is also indicative of false, fabricated and/or misleading work product for the reasons largely expressed in my trial testimony and reflected in my work product. The defendants' accounting work is not merely substandard or negligent but instead is reflective of false, fabricated and/or misleading work.

The Abbate Defendants object to Mr. Bettancourt's declaration on several grounds.

Defendants object to consideration of Mr. Bettancourt's declaration because it fails to set forth Mr. Bettancourt's qualifications.

■ Rule 702, Federal Rules of Evidence, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990).

Defendants complain that Mr. Bettancourt's declaration does not set forth his qualifications, other than to aver that he is a certified public accountant.

Plaintiff responds that "the totality of the materials submitted to the Court, which include Bettancourt's trial testimony in the underlying criminal case and his deposition, more than amply set forth his qualifications as an experienced forensic accountant and certified fraud examiner, as well as the materials he reviewed in support of his opinion in this case," citing Bettancourt's trial testimony at p. 516–531 and his deposition testimony at p. 1–23. Plaintiff cites *Miller v. Corrections Corp. of America*, 375 F.Supp.2d 889, 896 (D.Alaska 2005), in contending that "an expert report may, as do plaintiff's expert's reports, include or make reference to attachments reflecting the expert's opinions."

Defendants' objections to Mr. Bettancourt's declaration on the ground that he is unqualified to render the opinion is baseless. Defendants do not point to any specific evidence that Mr. Bettancourt is not qualified to give his expert opinion as to the accounting methods utilized by Defendants.

Defendants object that Mr. Bettancourt provides no foundation for his opinion in that he does not set forth any of the data he reviewed or any investigation that he undertook in reaching his conclusions; that it does not set forth his methodology; and that his testimony is speculative and conjectural.

However, as Plaintiff notes, Mr. Bettancourt's methodology and foundation is set forth in his trial testimony in the underlying criminal action. While certain of Mr. Bettancourt's conclusions are conjectural and speculative, these are matters going to the weight of his opinion, not its admissibility.

## B. GOVERNING STANDARDS.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Materiality is determined by the substantive law governing a claim or a defense. *Id.* The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party. *Id.*

The initial burden in a motion for summary judgment is on the moving party. The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to defeat summary judgment. *T.W. Elec.*, 809 F.2d at 630. The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *Id.* The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id.* The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id.* "The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id.* As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099 (9th Cir.2000):

The vocabulary used for discussing summary judgments is somewhat abstract. Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to plaintiff and defendant. Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather than to plaintiff and defendant. Finally, we distinguish among the initial burden of production

and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment ... In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial ... In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact ....

If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial ... In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything ... If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense ... If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment ... But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion.

210 F.3d at 1102–1103.

## C. *ABBATE DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED FACTS.*

1. *Issue No. 1: Plaintiff Cannot Maintain a Claim for Violation of Section 1983 Because She Cannot Meet the Requisite Elements.*

*DUF 1:* Tiffany Fenters ("Fenters" or "Plaintiff") worked for defendant Yosemite Chevron between June 2002 to March 2003.

*Plaintiff's Response:* UNDISPUTED.

*DUF 2:* Alejandro Aceves ("Aceves") also worked for Yosemite Chevron between April 2002 to March 2003.

*Plaintiff's Response:* UNDISPUTED.

*DUF 3:* Defendant Robert Abbate ("Abbate") has managed and operated Yosemite Chevron from 1999 to the present.

*Plaintiff's Response:* UNDISPUTED.

*DUF 4:* On March 27, 2003, Fenters quit her employment with Yosemite Chevron and submitted her written resignation on March 28, 2003.

*Plaintiff's Response:* UNDISPUTED.

*DUF 5:* On March 31, 2003, Abbate caught Aceves stealing from Yosemite Chevron by falsely voiding actual transactions and then stealing the overage in cash from the register at the end of his shift.

*Plaintiff's Response:* UNDISPUTED.

*DUF 6:* On March 31, 2003, Aceves confessed to Abbate that he was stealing by falsely voiding actual transactions and then taking the overage from the register.

*Plaintiff's Response:* UNDISPUTED.

*DUF 7:* On March 31, 2003, Aceves also told Abbate that Fenters taught him how to steal through the voiding transaction

scheme. Supporting Evidence: Exh. F, Aceves Depo. 98:918, 99:9–102:3, 103:3–22, 105:2–12, 106:20–108:21, 110:2–112::23, 129:13–23, 176:5–22, 194:4–196:2; Exh. B, Aceves trial testimony 267:3–12.

*Plaintiff's Response:* Disputed. During his trial testimony, Aceves testified that he learned how to do illegal voids himself, in order to obtain extra money. See Trial Transcript, pp. 266–267, 276, 285, 287. Aceves never told Abbate he had seen Fenters do any illegal voids or steal any money from the store. Trial Transcript, pp. 275. In connection with his firing of Aceves, Abbate first brought up Fenters' name, saying that "he knew Tiffany was in it." Trial Transcript, p. 291. Aceves thereafter only implicated Fenters and other employees in an attempt to deflect blame from himself and also because Abbate seemed to focus on her. See Trial Transcript, pp. 272–273, 291–292. Aceves also mentioned Fenters at the subsequent June 4, 2003 meeting because she was first suggested by Abbate himself. See Trial Transcript, p 268, 270, 272. Abbate indicated that Aceves could receive a shorter sentence if he helped make the case against Fenters easier. See Trial Transcript, p. 294. The prosecution echoed this offer. Bacciarini Deposition, p. 64. Abbate also told Aceves that if Aceves could get evidence to convict Fenters that he could benefit in his own case. See Trial Transcript, pp. 295. Bacciarini recalls that Aceves may have told him that he was pressured by Abbate to implicate Fenters. Bacciarini Deposition, p. 48–49. There is thus ample evidence that Abbate suggested Fenters as a possible embezzler and that Aceves never implicated her of his own accord. Aceves provided similar and more extensive testimony during his deposition. In addition to confirming that the subject events were fresher in his mind at the time of his criminal testimony, see Aceves Deposition, p. 168, Aceves confirmed that Abbate was the first person to suggest Tiffany Fenters. Aceves Deposition, p. 170, 171, 172, 182. Aceves was never pressured for additional information about anyone else who was identified as a possible embezzler, just Tiffany. Aceves Deposition, p. 173, 178. Despite the focus on Fenters, no one ever asked Aceves to provide details regarding any alleged conversations he had with Fenters, identify any dates where the two of them met, provide any phone records, identify any shift records where the two of them worked together, review any videotapes from the cash register area where the illicit instruction allegedly took place, or provide any bank records or other evidence of his obtaining illicit funds. See Aceves Deposition, p. 175–177, 187–188. Aceves testified "that's why it was kind of easy to lie because nobody actually went into detail." Aceves Deposition, p. 175. It seemed that the objective of Abbate and Hutton was to pursue Fenters and have him testify against her. Aceves Deposition, p. 178, 181. This evidence further demonstrates that Abbate and Hutton's entire object was to construct a case against Fenters, even if it meant disregarding the truth.

*Court Ruling:* DISPUTED. Although Aceves testified at his deposition that he told Abbate on March 21, 2003 that Plaintiff taught him how to steal through the voiding transaction scheme, Aceves testified differently and inconsistently at Plaintiff's criminal trial.

*DUF 8:* On March 31, 2003, Abbate did not threaten or coerce Aceves into confessing that he stole from Yosemite Chevron.

*Plaintiff's Response:* UNDISPUTED, but Plaintiff asserts that Abbate's coercion pertained to having Aceves falsely implicate Plaintiff.

*DUF 9:* On or about May 14, 2003, Abbate made a complaint to the Merced County District Attorney's Office ("Dis-

trict Attorney"), including its investigators, that he believed Fenters and Aceves were stealing from Yosemite Chevron through the voiding transaction scheme. Supporting Evidence: Exh. A, Abbate Dec. ¶ 5; Exh. G, Spencer Depo. 47:6–12, 73:1–8; Exh. H, Hutton Investigation Report.

*Plaintiff's Response:* Disputed, as the evidence shows that Abbate never had any good faith belief that Fenters was stealing. Abbate misrepresented to Hutton that only one employee worked on the cash register in a given shift, although he knew the opposite was true on a daily basis. Hutton Deposition, p. 20, 74; Abbate Deposition, p. 81, 99. Indeed, employees' log-on codes to the cash register were typically the last four digits of their phone numbers, and the phone numbers of employees were posted in the store. Abbate Deposition, p. 85. Abbate did not expect employees to review their shift reports on a line by line basis to ensure they were responsible for each transaction. Abbate Deposition, p. 90–91. Abbate also never told Bacciarini that more than one employee could have worked on the cash register during a given shift. Bacciarini Deposition, p. 16. Abbate reiterated this misrepresentation at trial, only later acknowledging during trial on cross examination that voids could not necessarily be linked to a particular employee, as opposed to a particular shift. See Preliminary hearing Transcript, p. 8, 17; Trial Transcript, p. 242. Hutton would have considered it important to know that actually multiple employees could work on the register in a given shift. Hutton Deposition, p. 21. Hutton would have considered this important because it would have made the task of identifying a particular employee who committed wrongdoing more difficult. Hutton Deposition, p. 22. Abbate conceded on cross-examination at the preliminary hearing that the voids attributable to Fenters were overstated in his spreadsheet. See Preliminary Hearing Transcript, pp. 52–59. Abbate also conceded that certain entries in his spreadsheet appeared to be entered wrongly, and he spent no time reviewing the initial draft spreadsheet he prepared. See Preliminary hearing Transcript, pp. 60–61; Abbate Deposition, p. 60, 64. Abbate also attributed certain shifts to Fenters, even though the underlying pay point reports did not contain her genuine signature. See Trial Transcript, pp. 491–492. Abbate also represented to Hutton that he had contact with another anonymous employee, who turned out to be Robert Wilson, around the time of Tiffany's separation from employment who first provided information regarding the alleged embezzlement, but Abbate did not tell Hutton that Wilson had been fired in December 2002 for stealing from Fenters. Hutton Deposition, p. 72, 92–94; Trial Transcript, p. 488. Abbate continued his pattern of misrepresentation at the preliminary hearing and trial by again merely referring to Wilson as an "ex-employee." See Preliminary Hearing Transcript, p. 41; Trial Transcript, p. 213. There never was an anonymous employee, and Abbate was aware of Wilson's firing at all pertinent times. See Abbate Deposition, p. 44–45, 97. Hutton would have considered this information important to include in his investigation report. Hutton Deposition, p. 90–91. Abbate also initially told Hutton that he has cut Fenters hours beginning in January 2003 because he suspected she was stealing from his business. See Hutton's Investigative Report, Exh. B to Fung. Decl., pp. 2. Abbate did not concede until trial that Fenters' hours had not been cut during this time period. See Trial Transcript, pp. 235–236. Indeed, even after Aceves first admitted stealing in March 2003, Abbate only believed that he was dealing with a petty issue. Abbate Deposition, p. 102. Abbate also did not provide any tax returns or other financial documents reflect-

ing a drop in revenues during the time when the embezzlement was allegedly occurring. Hutton Deposition, p. 22. Abbate also did not provide Hutton with any videotapes from the register area. Hutton Deposition, p. 23. This is further circumstantial evidence of his intent to conceal the truth and unduly influence the criminal proceedings against Fenters.

*Court Ruling:* UNDISPUTED; Plaintiff's evidence does not contradict DUF 9 as stated among other things.

*DUF 10:* The District Attorney's Office, including its investigators, were in charge of the investigation in Fenters' case. Exh. I, Bacciarini Depo. 74:6–75:1; Exh. G, Spencer Depo. 36:13–16; Exh. B, Jury Trial Transcript 30:6–18; Exh. J, Souza Depo. 94:7–16, 144:22–145:12; Exh. K, Vernon Fenters Depo. 51:10–13, 66:7–11, 69:7–10.

*Plaintiff's Response:* Disputed, as the evidence shows the District Attorney's Office was unduly influenced by Abbate's misrepresentations. The prosecution relied on Abbate's operating in good faith in proceeding to a preliminary hearing and trial. Bacciarini Deposition, p. 87–88. However, Abbate misrepresented to Hutton that only one employee worked on the cash register in a given shift, although he knew the opposite was true on a daily basis. Hutton Deposition, p. 20, 74; Abbate Deposition, p. 81, 99. Indeed, employees' log on codes to the cash register were typically the last four digits of their phone numbers, and the phone numbers of employees were posted in the store. Abbate Deposition, p. 85. Abbate did not expect employees to review their shift reports on a line by line basis to ensure they were responsible for each transaction. Abbate Deposition, p. 90–91. Abbate also never told Bacciarini that more than one employee could have worked on the cash register during a given shift. Bacciarini Deposition, p. 16. Abbate reiterated this misrepresentation at trial, only later ac-

knowledging during trial on cross examination that voids could not necessarily be linked to a particular employee, as opposed to a particular shift. See Preliminary hearing Transcript, p. 8, 17; Trial Transcript, p. 242. Hutton would have considered it important to know that actually multiple employees could work on the register in a given shift. Hutton Deposition, p. 21. Hutton would have considered this important because it would have made the task of identifying a particular employee who committed wrongdoing more difficult. Hutton Deposition, p. 22. Until the time the Cassabon firm was retained after the preliminary hearing, the District Attorney's Office relied on Abbate to review the financial information pertinent to the case against Fenters. Hutton Deposition, p. 33–34. Abbate's financial analysis was one of the reasons that Hutton submitted the case against Fenters for filing. Hutton Deposition, p. 82. Indeed, the Abbate spreadsheet was the only financial evidence then available in a prospective financial crime case. Hutton Deposition, pp. 82–83. Abbate conceded on cross-examination at the preliminary hearing that the voids attributable to Fenters were overstated in his spreadsheet. See Preliminary Hearing Transcript, pp. 52–59. Abbate also conceded that certain entries in his spreadsheet appeared to be entered wrongly, and he spent no time reviewing the initial draft spreadsheet he prepared. See Preliminary hearing Transcript, pp. 60–61; Abbate Deposition, p. 60, 64. Abbate also attributed certain shifts to Fenters, even though the underlying pay point reports did not contain her genuine signature. See Trial Transcript, pp. 491–492. Abbate also represented to Hutton that he had contact with another anonymous employee, who turned out to be Robert Wilson, around the time of Tiffany's separation from employment who first provided information regarding the alleged embez-

zlement, but Abbate did not tell Hutton that Wilson had been fired in December 2002 for stealing from Fenters. Hutton Deposition, p. 72, 92–94; Trial Transcript, p. 488. Abbate continued his pattern of misrepresentation at the preliminary hearing and trial by again merely referring to Wilson as an "exemployee." See Preliminary Hearing Transcript, p. 41; Trial Transcript, p. 213. There never was an anonymous employee, and Abbate was aware of Wilson's firing at all pertinent times. See Abbate Deposition, p. 44–45, 97. Hutton would have considered this information important to include in his investigation report. Hutton Deposition, p. 90–91. Abbate also initially told Hutton that he has cut Fenters hours beginning in January 2003 because he suspected she was stealing from his business. See Hutton's Investigative Report, Exh. B to Fung. Decl., pp. 2. Abbate did not concede until trial that Fenters' hours had not been cut during this time period. See Trial Transcript, pp. 235–236. Indeed, even after Aceves first admitted stealing in March 2003, Abbate only believed that he was dealing with a petty issue. Abbate Deposition, p. 102. Abbate also did not provide any tax returns or other financial documents reflecting a drop in revenues during the time when the embezzlement was allegedly occurring. Hutton Deposition, p. 22. Abbate also did not provide Hutton with any videotapes from the register area. Hutton Deposition, p. 23. This is further circumstantial evidence of his intent to conceal the truth and unduly influence the criminal proceedings against Fenters. The record also shows that the District Attorney's Office did no independent investigation that would have permitted it to exercise its discretion in any genuine and autonomous manner. Spencer acknowledged, although it was not done in this case, that his office commonly sought the assistance of a forensic accountant or fraud examiner during the investigation stage of a case. Spencer Deposition, p. 56. Indeed, Hutton conceded at trial that he did nothing to corroborate Aceves' statement and Abbate's spreadsheet, even though he knew Abbate was not an accountant and that confessions are not always the full truth. See Trial Transcript, pp. 377–378, 401–404. Hutton never did an independent analysis of the Abbate spreadsheets. Bacciarini Deposition, p. 22; Abbate Deposition, p. 108. Hutton also never tested the store surveillance system himself, even though the system would depict money taken from the register by an employee. Hutton Deposition, p. 24. Hutton never took any steps to obtain any financial information pertaining to Fenters. Hutton Deposition, p. 28–29; Trial Transcript, pp. 443. Hutton did not attempt to speak with Fenters' parents as part of his investigation, even though there was an allegation that Fenters had been "cut off" by them and therefore had a motive to steal. Hutton Deposition, p. 30. (Fenters' father, Virgil Fenters, refuted this allegation at trial. See Trial Transcript, p. 418.) Hutton also never obtained any shift records that corroborated the allegation that Fenters' hours were cut in February 2003 due to her being suspected of stealing. Hutton Deposition, p. 71. Hutton "assumed there was a friendly connection between Fenters and Aceves but made no effort to confirm that through investigation, i.e., phone records, or other Yosemite Chevron employees, Hutton Deposition, p. 31." Hutton also never asked for specifics regarding where Aceves and Fenters were when Fenters allegedly taught him to do illegal voiding. Hutton Deposition, p. 31–32. Hutton never investigated any information suggesting that Abbate was a drug user, although it was provided by the defense during discovery and Hutton acknowledges that such matters can have a bearing on a witness' credibility in a case involving alleged financial loss. Hutton Deposition, p.

83–84; Bacciarini Deposition, p. 88. Hutton never asked Aceves if he had prior cash register experience. Trial Transcript, p. 391. Hutton never investigated how many employees worked or could use the register in a given shift. Trial Transcript, p. 393. The evidence also shows that Abbate was part of the District Attorney's investigative team for purposes of Fenters' criminal case. Hutton acknowledges that Abbate was assisting in the District Attorney's investigation of the Fenters matter between May 14 and June 4, 2003. Hutton Deposition, p. 43. Abbate also acknowledges he assisted in the investigation and had his most extensive contacts with Hutton during the investigative phase of the Fenters criminal case. Abbate Deposition, p. 104, 124. Hutton testified an interview protocol was set up between Abbate and himself with respect to the June 4, 2003 interview of Aceves. Hutton Deposition, p. 42–43. Abbate also set up the June 4, 2003 interview with Aceves. Hutton Deposition, p. 44. Abbate actually conducted the first part of that interview, which was done in conformity with guidelines provided by Hutton. Hutton Deposition, pp. 44–45; Abbate Deposition, p. 109–110. Abbate provided an additional eight months of financial analysis at the District Attorney's request. Hutton Deposition, p. 44; Abbate Deposition, p. 79. Hutton spent approximately 20 hours doing his work on the Fenters case, while Abbate worked 35 hours, not including time he spent assisting in interviews at Hutton's direction. Hutton Deposition, p. 57; Abbate Deposition, p. 61–62. All of Hutton's investigation is reflected in his initial and follow up reports. Hutton Deposition, p. 57. Bacciarini, the lead prosecutor at the preliminary hearing and at trial, has as many contacts with Abbate as he did Hutton in preparation for the preliminary hearing. Bacciarini Deposition, pp. 10–11. Additionally, James Swanson, who was the prosecutor handling the case against Fenters after the preliminary hearing until just before it went to trial, told Fenters' attorney that he was not permitted to resolve the case via a misdemeanor petty theft plea. See Virgil Fenters Deposition, pp. 32, 35–36. This is further circumstantial evidence of the District Attorney's compromised status in the Fenters criminal case.

*Court Ruling:* DISPUTED.

*DUF 11:* The District Attorney's Office, including its investigators, controlled the investigation into Fenters' alleged embezzlement. Supporting Evidence: see DUF 10.

*Plaintiff's Response:* Disputed on identical grounds set forth in response to DUF 10.

*Court Ruling:* Disputed.

*DUF 12:* Wayne Hutton was the lead investigator for the District Attorney's office in the criminal case against Fenters.

*Plaintiff's Response:* UNDISPUTED, although for reasons stated in response to DUF 10, Abbate was functionally the lead investigator.

*DUF 13:* Hutton had not met Abbate prior to the criminal action.

*Plaintiff's Response:* UNDISPUTED.

*DUF 14:* Abbate prepared a spreadsheet recording average voided transactions and the dollar amount of those transactions, of Fenters, Aceves, and other employees in the gas station (the "Abate Spreadsheet"), which was attached to Hutton's investigation report.

*Plaintiff's Response:* Disputed as to the good faith and completeness of the spreadsheet document. Until the time the Cassabon firm was retained after the preliminary hearing, the District Attorney's Office relied on Abbate to review the financial information pertinent to the case against Fenters. Hutton Deposition, p. 33–34.

Abbate's financial analysis was one of the reasons that Hutton submitted the case against Fenters for filing. Hutton Deposition, p. 82. Indeed, the Abbate spreadsheet was the only financial evidence then available in a prospective financial crime case. Hutton Deposition, pp. 82–83. Abbate conceded on cross-examination at the preliminary hearing that the voids attributable to Fenters were overstated in his spreadsheet. See Preliminary Hearing Transcript, pp. 52–59. Abbate also conceded that certain entries in his spreadsheet appeared to be entered wrongly, and he spent no time reviewing the initial draft spreadsheet he prepared. See Preliminary hearing Transcript, pp. 60–61; Abbate Deposition, p. 60, 64. Abbate also attributed certain shifts to Fenters, even though the underlying pay point reports did not contain her genuine signature. See Trial Transcript, pp. 491–492. Abbate also did not provide any tax returns or other financial documents reflecting a drop in revenues during the time when the embezzlement was allegedly occurring. Hutton Deposition, p. 22. Abbate also did not provide Hutton with any videotapes from the register area. Hutton Deposition, p. 23. This is further circumstantial evidence of his intent to conceal the truth and unduly influence the criminal proceedings against Fenters.

*Court Ruling:* DUF 14 is UNDISPUTED; Plaintiff's evidence does not contradict the fact that Abbate prepared the spreadsheet attached to Hutton's investigative report.

*DUF 15:* On June, 4, 2003, Aceves met Abbate at his office.

*Plaintiff's Response:* UNDISPUTED.

*DUF 16:* On June 4, 2003, Aceves again confessed to Abbate that he had been stealing through a voiding transaction scheme.

*Plaintiff's Response:* Disputed. During his trial testimony, Aceves testified that he learned how to do illegal voids himself, in order to obtain extra money. See Trial Transcript, pp. 266–267, 276, 285, 287. Aceves never told Abbate he had seen Fenters do any illegal voids or steal any money from the store. Trial Transcript, pp. 275. In connection with his firing of Aceves, Abbate first brought up Fenters' name, saying that "he knew Tiffany was in it." Trial Transcript, p. 291. Aceves thereafter only implicated Fenters and other employees in an attempt to deflect blame from himself and also because Abbate seemed to focus on her. See Trial Transcript, pp. 272–273, 291–292. Aceves also mentioned Fenters at the subsequent June 4, 2003 meeting because she was first suggested by Abbate himself. See Trial Transcript, p 268, 270, 272. Abbate indicated that Aceves could receive a shorter sentence if he helped make the case against Fenters easier. See Trial Transcript, p. 294. The prosecution echoed this offer. Bacciarini Deposition, p. 64. Abbate also told Aceves that if Aceves could get evidence to convict Fenters that he could benefit in his own case. See Trial Transcript, pp. 295. Bacciarini recalls that Aceves may have told him that he was pressured by Abbate to implicate Fenters. Bacciarini Deposition, p. 48–49. There is thus ample evidence that Abbate suggested Fenters as a possible embezzler and that Aceves never implicated her of his own accord. Aceves provided similar and more extensive testimony during his deposition. In addition to confirming that the subject events were fresher in his mind at the time of his criminal testimony, see Aceves Deposition, p. 168, Aceves confirmed that Abbate was the first person to suggest Tiffany Fenters. Aceves Deposition, p. 170, 171, 172, 182. Aceves was never pressured for additional information about anyone else who was identified as a possible embezzler, just Tiffany. Aceves Deposition, p. 173, 178. Despite the focus

on Fenters, no one ever asked Aceves to provide details regarding any alleged conversations he had with Fenters, identify any dates where the two of them met, provide any phone records, identify any shift records where the two of them worked together, review any videotapes from the cash register area where the illicit instruction allegedly took place, or provide any bank records or other evidence of his obtaining illicit funds. See Aceves Deposition, p. 175–177, 187–188. Aceves testified "that's why it was kind of easy to lie because nobody actually went into detail." Aceves Deposition, p. 175. It seemed that the objective of Abbate and Hutton was to pursue Fenters and have him testify against her. Aceves Deposition, p. 178, 181. This evidence further demonstrates that Abbate and Hutton's entire object was to construct a case against Fenters, even if it meant disregarding the truth.

*Court Ruling:* DUF 16 is UNDISPUTED. The record establishes that on June 4, 2003, Aceves again confessed to Abbate that he had been stealing through a voiding transaction scheme; that Aceves changed his position at trial does not contradict this fact.

*DUF 17:* On June 4, 2003, Aceves again told Abbate that Fenters was the person that had taught him how to steal through the voiding transaction scheme.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 16.

*Court Ruling:* DUF 17 is UNDISPUTED; Plaintiff's evidence does not contradict what Aceves told Abbate on June 4, 2003.

*DUF 18:* Aceves testified in deposition that he was not under any threats or coercion when he went to meet with Abbate on June 4, 2003, and told him how he was stealing. Supporting Evidence: Supporting Evidence: Exh. F, Aceves Depo.

98:918, 99:9–102:3, 103:3–22, 105:2–12, 106:20–108:21, 110:2–112::23, 129:13–23, 176:5–22, 194:4–196:2; Exh. B, Aceves trial testimony 267:3–12.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 16.

*Court Ruling:* DUF 18 is UNDISPUTED; Aceves so testified under oath in his deposition. Further, Plaintiff does not dispute DUF 8.

*DUF 19:* Aceves testified in deposition that he was not under any threats or coercion when he went to meet with Abbate on June 4, 2003, and told him that Fenters taught him how to steal. Supporting Evidence: Exh. F, Aceves Depo., 50:11–51:5, 111:8–115:21, 117:7–119:14, 129:13–132:17, 159:4–160:13.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 16.

*Court Ruling:* DUF 19 is UNDISPUTED; Aceves so testified under oath at his deposition. Plaintiff has not provided evidence Aceves was under any threat or coercion when he gave his deposition testimony.

*DUF 20:* Aceves ultimately pled no contest to felony embezzlement for stealing from Yosemite Chevron.

*Plaintiff's Response:* UNDISPUTED.

*DUF 21:* Aceves readily admits that he stole from Yosemite Chevron through voiding transactions.

*Plaintiff's Response:* UNDISPUTED.

*DUF 22:* On June 23, 2003, the District Attorney filed a Complaint against Fenters for Embezzlement titled the *People of the State of California v. Tiffany Michelle Fenters,* Merced County Superior Court Case No. MF36082.

*Plaintiff's Response:* UNDISPUTED.

*DUF 23:* Abbate did not participate in or control the decision to file the Complaint. Supporting Evidence: Exh. O, Criminal Complaint; Exh. P, Bacciarini Decl., ¶ 5; Exh. M, Abbate Depo., 121:7–16; Exh. A, Abbate Decl., ¶ 7.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DISPUTED. There is evidence from which it may be inferred that Abbate influenced the filing decision in the criminal case.

*DUF 24:* Mark Bacciarini ("Bacciarini") was the Deputy District Attorney for the District Attorney's Office that conducted the preliminary hearing and jury trial.

*Plaintiff's Response:* UNDISPUTED.

*DUF 25:* It was the District Attorney's decision to take the matter to preliminary hearing. Supporting Evidence: Exh. I, Bacciarini Depo., 74:15–75:22.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DUF 25 is UNDISPUTED; Plaintiff's evidence does not contradict that the District Attorney made the decision to proceed to a preliminary hearing, even if influenced by Abbate.

*DUF 26:* On July 30, 2004, a preliminary hearing was held in *People v. Fenters.*

*Plaintiff's Response:* UNDISPUTED.

*DUF 27:* Judge Ronald R. Hansen ruled at the preliminary hearing that the Abbate Spreadsheet was inadmissible.

*Plaintiff's Response:* UNDISPUTED.

*DUF 28:* Judge Hansen also ruled at the preliminary hearing there was sufficient evidence to show the alleged felony was committed by Fenters.

*Plaintiff's Response:* UNDISPUTED, although Plaintiff contends this finding was based on false and fabricated evidence.

*DUF 29:* On August 12, 2004, the District Attorney filed the Information in *People of the State of California v. Tiffany Michelle Fenters,* Merced County Superior Court Case No. 29142.

*Plaintiff's Response:* UNDISPUTED.

*DUF 30:* Abbate did not participate in or control the decision to file the Information. Supporting Evidence: Exh. Q, Criminal Information; Exh. P, Bacciarini Decl., ¶ 4; Exh. I, Bacciarini Depo. 74:15–75:22; Exh. A, Abbate Decl., ¶ 8.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DUF 30 is UNDISPUTED; Plaintiff's evidence does not negate the absence of evidence that Abbate did not participate in or control the decision to file the Information, even if he influenced the decision.

*DUF 31:* After the preliminary hearing, the District Attorney hired an outside accounting expert, Cassabon & Associates, as a witness for the prosecution.

*Plaintiff's Response:* UNDISPUTED.

*DUF 32:* The District Attorney hired Cassabon & Associates based on its prosecutorial discretion. Supporting Evidence: Exh. G, Spencer Depo., 66:7–24, 77:17–78:3; Exh. P, Bacciarini Decl., ¶ 2.

*Plaintiff's Response:* Disputed on the identical grounds stated in response to DUF 10.

*Court Ruling:* DUF 32 is UNDISPUTED. Plaintiff's evidence does not contradict that the District Attorney hired Cassabon & Associates to provide expert services and testimony for the prosecution and provides no evidence that Abbate had any participation in that decision.

*DUF 33:* Cassabon & Associates' assignment was to analyze daily register records to determine if anything was suspicious with the transactions taking place at Yosemite Chevron. Supporting Evidence: Exh. T, Fung Depo., 20:9–19; Exh. B, Jury Trial Transcript, 320:19–22.

*Plaintiff's Response:* Disputed. As defendant Fung testified at the criminal trial, his assignment was "to determine whether there [were] assets misappropriated at the Yosemite Chevron gas station, and if any, estimate the amount of ... embezzlement." Trial Transcript, p. 320. In his deposition, Fung described his assignment as "[t]racing the money." Fung Deposition, p. 12.

*Court Ruling:* DISPUTED. Defendants' characterization of the employment of Cassabon & Associates is *too* limited; it included a fraud investigation, calculating the amount of loss, and tracing the money.

*DUF 34:* Cassabon & Associates went through the daily register records (Pay Point Reports) to analyze the frequency of voided transactions in relationship to the total amount of sales transactions among the various employees.

*Plaintiff's Response:* UNDISPUTED.

*DUF 35:* Victor Fung ("Fung"), of Cassabon & Associates, performed an analysis of Yosemite Chevron's daily register records (Pay Point Reports) and determined that Fenters embezzled cash from Yosemite Chevron, as memorialized in his Report of October 31, 2004. Supporting Evidence: Ex. B, Jury Trial Transcript, 320:23:321:9. 322:1–10, 344:3–10

*Plaintiff's Response:* Disputed. Fung did not "determine" anything, but merely reached an opinion that cash was taken. Additionally, Fung reached this opinion without considering a number of factors, including how voids could occur, whether multiple employees worked on the register during a given shift, the internal controls of the business, and the videotapes that would have shown what the ordinary course of business was. Trial Transcript, pp. 345–354. Fung attributed all of the voids on the shifts Fenters worked to her, even though there was preceding trial testimony that established that multiple employees worked and used the register each shift. See Trial Testimony, pp. 242, 347, 349. During the criminal trial, plaintiff's accounting expert, John Bettencourt, testified that it was necessary for a forensic accountant under the circumstances presented to evaluate the internal controls of the subject business, as well as its cash register policies, both as written and practiced. See Trial Transcript, p. 521–522. Bettencourt visited Yosemite Chevron posing as a customer five times and found internal controls lacking, with multiple employees working the cash register during a given shift. See Trial Transcript, pp. 528. As many as eight people were found to use a register during a two shift period. See Trial Transcript, pp. 537–538. Bettencourt also found that Fung's reliance on an "acceptable void" figure to be specious because nine of the twelve employees exceeded that average, and, under Fung's criteria, would have been stealing. See Trial Transcript, pp. 544. In his deposition, Fung acknowledged that he was not trained as a forensic accountant and had only been a CPA for two months at the time he was assigned the Fenters case. Fung Deposition, pp. 14, 17. Fung was not attempting to follow any accounting standards or protocols in this case. Fung Deposition, p. 15. Fung did not contact Abbate or anyone else affiliated with Yosemite Chevron. Fung Deposition, p. 23. Fung never visited the business location, reviewed the model cash register used at the business, or reviewed any surveillance videos from the business. Fung Deposition, p. 23–24. Fung also did not review any financial or profit/loss statements of

Yosemite Chevron. Fung Deposition, p. 24. No one ever offered these documents to Fung, and he did not request them. Fung Deposition, p. 25, 62. Fung also did not receive a list of Yosemite Chevron employees. Fung Deposition, p. 25. Fung described his approach to his assignment as figuring out the frequency of void transactions in relation to the total sales transactions and then make an employee by employee comparison. Fung Deposition, p. 30. Fung only reviewed the pay point reports and the criminal report, which included Abbate's spreadsheet. Fung Deposition, p. 23, 31. Fung assumed that an employee who signed a pay point report was responsible for every transaction reflected therein, even though he never tested that assumption. Fung Deposition, p. 40. Fung considered the possibility that a pay point report might reflect more than one employee's work product but discounted it in his methodology, based on the further assumption that "that chance is the same for all employees." Fung Deposition, p. 41, 43. Fung felt this variable could be discounted even if certain employees were intentionally stealing and were therefore trying to conceal their identities. Fung Deposition, p. 42–43. Fung did not take any action in an attempt to validate this assumption, such as sampling reports or interviewing employees. Fung Deposition, p. 45. Fung also did not consider that different numbers of people worked different shifts. Fung Deposition, p. 46–47. Fung did not consider the days and shifts on which inventory was recorded in his analysis. Fung Deposition, p. 52. Fung also did nothing to assess the quality of the controls in place at Yosemite Chevron, although he recognized that this could affect the reliability of the records he reviewed. Fung Deposition, p. 53–54. Overall, Fung's approach was similar to the Abbate's spreadsheet approach. Bacciarini Deposition, p. 14. In Bettencourt's expert report, he declared that the spreadsheet provided by defendant Robert Abbate and the work product of Cassabon were indicative of false, fabricated and/or misleading work product Bettencourt opined that the defendants' accounting work was not merely substandard or negligent but instead is reflective of false, fabricated, and/or misleading work. See Bettencourt Report, Exhibit A. In his deposition, Bettencourt confirmed his report and further testified that Abbate's and Cassabon's work product was misleading and misstated the evidence. See Bettencourt Deposition, pp. 33, 38, 78, 97. Bettencourt testified that it was not reasonable or in good faith actions to attribute all of the voids on a particular shift to a specific employee. Bettencourt Deposition, p. 157–158, 161. Both Abbate's spreadsheet and Fung's report were similar in this respect. Bettencourt Deposition, p. 160, 161. Bettencourt is of the opinion that these actions could raise an inference of bad faith that could be found by a jury. Bettencourt Deposition, p. 163.

*Court Ruling:* DUF 35 is UNDISPUTED that Fung analyzed the daily register records (Pay Point Reports) and opined that Fenters embezzled cash from Yosemite Chevron, as memorialized in his Report of October 31, 2004. That Plaintiff claims her evidence shows that Fung's analysis was incomplete, dishonest and incompetent, does not contradict this fact.

*DUF 36:* Fung did not rely upon the spreadsheet or analysis of Robert Abbate in preparing his Report in the criminal action. Supporting Evidence: Exh. B, Jury Trial Transcript, 320–321:9; Exh. T, Bettancourt Depo., 85:7–11, 121:6–8; Exh. S, Fung Decl. ¶ 16.

*Plaintiff's Response:* Disputed. Fung testified in his deposition that the first thing he did after Cassabon's retention was to meet with defendant Hutton and

the then assigned prosecutor, James Swanson. Fung Deposition, p. 18. During a one hour meeting, Fung was told that the prosecution suspected that Fenters was stealing money by voiding transactions. Fung Deposition, p. 18. Fung was told the prosecution wanted him to analyze the pay point reports, a box of which he received on that occasion. Fung Deposition, p. 20. Fung also received Hutton's report which had Abbate's spreadsheet as an attachment. Fung Deposition, pp. 19, 22. Fung was told the attachment was a spreadsheet prepared by Abbate himself. Fung Deposition, p. 22. Overall, Fung's approach was similar to the Abbate's spreadsheet approach. Bacciarini Deposition, p. 14.

*Court Ruling:* DUF 36 is DISPUTED. Plaintiff's evidence raises a question of fact that Fung relied on or analyzed Abbate's spreadsheet and attached to Hutton's report.

*DUF 38:* Fung decided on the methodology to be utilized for his analysis. Supporting Evidence: Exh. T, Fung Depo., 30:10–15, 35:15–17, 36:5–11; Exh. S, Fung Decl. ¶ 6; Exh. U, Bettancourt Depo. 45:4–10

*Plaintiff's Response:* Disputed on the identical grounds stated in response to DUF 37.

*Court Ruling:* DUF 38 is DISPUTED. Plaintiff's evidence permits the inference that Fung was so inexperienced and incompetent as to raise a question of fact that Fung decided the methodology utilized for his analysis.

*DUF 39:* Cassabon & Associates, including Fung, had no contact with Abbate at any time regarding the criminal action.

*Plaintiff's Response:* UNDISPUTED.

*DUF 40:* Fung was not told anything about the individual who was the principal for the victim, Yosemite Chevron, during the course of his work in the criminal action. Supporting Evidence: Exh. T, Fung Depo., 60:16–19.

*Plaintiff's Response:* Disputed on the identical grounds stated in response to DUF 37.

*Court Ruling:* DUF 40 is UNDISPUTED. Plaintiff's evidence does not contradict Fung's deposition testimony that he was not told anything about Abbate.

*DUF 41:* Cassabon & Associates, including Fung, never went to Yosemite Chevron as part of their work in *People v. Fenters.*

*Plaintiff's Response:* UNDISPUTED.

*DUF 42:* Cassabon & Associates, including Fung, never contacted any employees from Yosemite Chevron as part of their work in *People v. Fenters.*

*Plaintiff's Response:* UNDISPUTED.

*DUF 43:* Fung never contacted any accountant or bookkeeper that had any relationship with Yosemite Chevron.

*Plaintiff's Response:* UNDISPUTED.

*DUF 44:* Bacciarini never discussed the Abbate family with Fung or Cassabon & Associates.

*Plaintiff's Response:* UNDISPUTED.

*DUF 45:* Fung did not have any contact with members of the Abbate family during the course of his work in the criminal action.

*Plaintiff's Response:* UNDISPUTED.

*DUF 46:* Fung never asked to review any materials that were not provided to him.

*Plaintiff's Response:* UNDISPUTED.

*DUF 47:* The criminal trial in *People v. Fenters* took place between October 5 to 13, 2005.

*Plaintiff's Response:* UNDISPUTED.

*DUF 48:* Bacciarini did not mention or reference the Abbate Spreadsheet in his Opening Statement at the criminal trial.

Supporting Evidence: Exh. B, Jury Trial Transcript, 171–181; Exh. I, Bacciarini Depo., 72:6–25.

*Plaintiff's Response:* Disputed. As the transcript of the opening statement at trial shows, Bacciarini argued for Fenters' guilt based on several factors, not merely the financial analysis performed by Cassabon. Bacciarini also recalls that Abbate's financial analysis was part of his presentation at both the preliminary hearing and at trial. Bacciarini Deposition, 83–84.

*Court Ruling:* DUF 48 is UNDISPUTED. Plaintiff's evidence does not contradict that Bacciarini did not mention or refer to the Abbate Spreadsheet in his opening statement. Bacciarini's deposition testimony cited by Plaintiff does not state that Bacciarini relied on Abbate's analysis at trial.

*DUF 49:* In his Opening Statement, Bacciarini argued Fenters was guilty based on Fung's Report. Supporting Evidence: Exh. B, Jury Trial Transcript, 171–181.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 48.

*Court Ruling:* DUF 49 is DISPUTED to the extent that Bacciarini relied on other factors as well as the report prepared by Fung; but UNDISPUTED that Bacciarini did not refer to the Abbate Spreadsheet.

*DUF 50:* At the criminal trial, Bacciarini relied upon Cassabon & Associates' analysis of Yosemite Chevron's daily register records. Supporting Evidence: Exh. B, Jury Trial Transcript, 171–181, 318–363, 642–657, 694, 697, 198–224, 222:22–255, 245–250; Exh. I, Bacciarini Depo., 72:2–19.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 48.

*Court Ruling:* DUF 50 is UNDISPUTED. Plaintiff's evidence does not contra-

dict that Bacciarini relied, at least in part, on Fung's report.

*DUF 51:* The District Attorney did not mark or introduce the Abbate Spreadsheet into evidence at the criminal trial.

*Plaintiff's Response:* Disputed. Bacciarini recalls that Abbate testified at both the preliminary hearing and the criminal trial regarding his financial analysis. Bacciarini Deposition, p. 83–84. Overall, Fung's approach was similar to the Abbate's spreadsheet approach. Bacciarini Deposition, p. 14.

*Court Ruling:* DUF 51 is UNDISPUTED. Abbate's testimony at the preliminary hearing is irrelevant to DUF 51 because his spreadsheet was ruled inadmissible at the preliminary hearing. More importantly, DUF 51 pertains to the introduction of Abbate's spreadsheet at the criminal trial. Plaintiff presents no evidence that the Abbate Spreadsheet was introduced at the criminal trial.

*DUF 52:* During the criminal trial, the District Attorney did not ask Abbate to testify about his analysis or findings from the Abbate Spreadsheet. Supporting Evidence: Exh. B, Jury Trial Transcript 198–224, 222:22–255, 245–250; Exh. I, Bacciarini Depo., 72:6–19.

*Plaintiff's Response:* Disputed. Bacciarini recalls that Abbate testified at both the preliminary hearing and the criminal trial regarding his financial analysis. Bacciarini Deposition, p. 83–84. Abbate testified about his investigation into Fenters' and Aceves' voided transactions on pages 221–222 of the criminal trial transcript. Even though he did not make specific reference to his spreadsheet, Abbate did testify about his findings and underlying methodology. It is because of this direct examination testimony that the defense was able to question Abbate about the spreadsheet itself on cross examination.

See Trial Transcript, pp. 236–241. Even Hutton acknowledges this took place. Hutton Deposition, p. 82.

*Court Ruling:* DISPUTED.

*DUF 53:* During the criminal trial, Fung did not testify about the calculations or analysis made by Abbate.

*Plaintiff's Response:* Disputed, as Bacciarini recalls that Fung's approach was similar to the Abbate's spreadsheet approach. Bacciarini Deposition, p. 14.

*Court Ruling:* DUF 53 is UNDISPUTED. Plaintiff points to no testimony by Fung, which speaks of itself, pertaining to the calculations or analysis made by Abbate; that the Cassabon Defendants' analysis was similar to that of Abbate does not negate that Fung did not testify about Abbate's calculations or analysis.

*DUF 54:* Bacciarini did not mention or reference the Abbate Spreadsheet in his Closing Statement at the criminal trial.

*Plaintiff's Response:* Disputed. As the transcript of the trial shows, Bacciarini argued for Fenters' guilt based on several factors, not only the financial analysis performed by Cassabon. Bacciarini also recalls that Abbate's financial analysis was part of his presentation at both the preliminary hearing and at trial. Bacciarini Deposition, 83–84.

*Court Ruling:* DUF 54 is UNDISPUTED. Plaintiff's evidence does not contradict that Bacciarini did not mention or reference the Abbate Spreadsheet during his closing argument.

*DUF 55:* In his Closing Statement, Bacciarini argued Fenters was guilty based on the Fung Report and Aceves statements. Supporting Evidence: Exh. B, Jury Trial Transcript 642–657, 694–697.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 54.

*Court Ruling:* DUF 55 is UNDISPUTED that Bacciarini relied primarily on the Fung report and the Aceves statements in his closing argument.

*DUF 56:* The first time Aceves told anyone from the District Attorney's office that Fenters was not involved in the voiding transaction scheme was during the criminal trial. Supporting Evidence: Exh. I, Bacciarini Depo., 47:6–48:5; Exh. B, Jury Trial Transcript 648:9–17; Exh. F, Aceves Depo., 69:11–25, 70:13–20, 185:23–186:15, 129:13–132:18.

*Plaintiff's Response:* Disputed. Defendant Hutton was present at the June 4, 2003 meeting when Aceves only mentioned Fenters because she was first suggested by Abbate himself. See Trial Transcript, p 268, 270, 272. Abbate indicated that Aceves could receive a shorter sentence if he helped make the case against Fenters easier. See Trial Transcript, p. 294. The prosecution echoed this offer. Bacciarini Deposition, p. 64. Abbate also told Aceves that if Aceves could get evidence to convict Fenters that he could benefit in his own case, in part in order to "lure him in." See Trial Transcript, pp. 295; Abbate Deposition, p. 107. There is thus ample evidence that Abbate suggested Fenters as a possible embezzler and that Aceves never implicated her of his own accord. There is thus evidence that Hutton, who was present for the interview, was on notice of these facts as of June 2003.

*Court Ruling:* DUF 56 is UNDISPUTED. The transcript of the June 4, 2003 interview between Aceves, Abbate and Hutton does not support Plaintiff's assertions. The transcript is clear that Aceves was the first person to mention Fenters as a participant in Aceves' scheme to embezzle from Yosemite Chevron. Further, Plaintiff's evidence does not contradict the evidence that the first time Aceves told anyone from the District Attorney's office

that Fenters was not involved in the voiding transaction scheme was during the criminal trial

*DUF 57:* Aceves never told Abbate that he was not telling the truth when he said Fenters had taught him how to steal. Supporting Evidence: Exh. F, Aceves Depo. 69–11:25, 70:13–20, 185:23–186:15, 129:13–132:18.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 16.

*Court Ruling:* DUF 57 is UNDISPUTED. Plaintiff's evidence does not contradict Aceves deposition testimony that he did not tell Abbate that he was lying about Plaintiff.

*DUF 58:* Abbate was not in charge of the investigation of the criminal case against Fenters. Supporting Evidence: Exh. I, Bacciarini Depo. 74:15–17.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DUF 58 is UNDISPUTED as there is not evidence that Abbate was in charge of the investigation of the criminal case, even though there is evidence from which it may be inferred that Abbate influenced the investigation.

*DUF 59:* It was within the District Attorney's Office, including its investigators, discretion to determine what evidence to gather to prosecute Fenters.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DUF 59 is UNDISPUTED. Although there is evidence that Abbate sought to influence the prosecution and trial of Plaintiff, those decisions were made by the prosecution.

*DUF 60:* From commencement of the criminal action until its conclusion, the District Attorney's office had the discretion whether to file the complaint and information, prosecute, dismiss or plea bargain.

*Plaintiff's Response:* Disputed on identical grounds states in response to DUF 10.

*Court Ruling:* DUF 60 is UNDISPUTED. Although there is evidence that Abbate sought to influence the prosecution and trial of Plaintiff, those decisions were made by the prosecution.

*DUF 61:* Deputy District Attorney Bacciarini did not prosecute the case any differently because the victim was a member of the Abbate family.

*Plaintiff's Response:* Disputed. Bacciarini testified that he did not know why Abbate's complaint did not go to the Merced Police Department first. Bacciarini Deposition, p. 55. Hutton acknowledges that Abbate could have taken his allegations to the Merced Police Department instead of the District Attorney's Office. Hutton Deposition, p. 45. Moreover, the District Attorney's Office has directed similar potential cases to the Merced PD. See Exhibit B, Email communication from the Merced DA's Office re: a potential embezzlement case in the City of Merced. Spencer could not provide only two examples of embezzlement cases in the last five years of his tenure where his officer was the lead investigating agency. Spencer Deposition, p. 35–38.

*Court Ruling:* DUF 63 is UNDISPUTED. Plaintiff's evidence does not show whether Bacciarini's prosecution of the criminal case was different from other cases he prosecuted.

*DUF 62:* Abbate did not control the District Attorney's decision to proceed to trial.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DUF 62 is UNDISPUT-ED. Plaintiff's evidence does not raise an inference that Abbate controlled the District Attorney's decision to proceed to trial, although there is evidence that Abbate sought to influence the prosecution.

*DUF 63:* The District Attorney did not prosecute or take the criminal case to trial due to pressure from Robert Abbate or the Abbate family. Supporting Evidence: Exh. G, Spencer Depo. 73:1–8; Exh. J, Souza Depo., 31:8–12, 126:19–127:13, 158:16–22, 40:14–18, 102:15–20; Exh. W, Hutchins Depo., 25:21–25, 29:20–30:1, 44:23–45:17, 46:16–48:15; Exh. U, Bettancourt Depo., 26:25–27:4, 28:13–17, 31:6–10, 33:16–21, Exp. P, Bacciarini Decl. ¶ 5; Exh. E, Plaintiff Depo., 14:14–17, 16:19–17–25.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DUF 65 is UNDISPUT-ED. Plaintiff's evidence does not contradict that Plaintiff was not prosecuted only because of pressure from Abbate or the Abbate family, although there is evidence from which it may be inferred that Abbate sought to influence the prosecution.

*DUF 64:* The District Attorney relied upon Aceves' confession and statements in prosecuting Fenters.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10 and DUF 48.

*Court Ruling:* DUF 64 is UNDISPUT-ED. Plaintiff's evidence does not contradict that the prosecution relied on and used the Aceves' statements in prosecuting Plaintiff.

*DUF 65:* The District Attorney also relied upon the forensic accounting performed by Cassabon & Associates to prosecute Fenters.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 48.

*Court Ruling:* DUF 65 is UNDISPUT-ED that the prosecution relied on Cassabon's Fung Report and work in prosecuting Plaintiff.

*DUF 66:* Bacciarini would have prosecuted and taken this matter to trial based alone on the statements of Aceves and evaluation done by Cassabon & Associates.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DISPUTED based on Abbate's participation in the investigation.

*DUF 67:* If Abbate never would have prepared a spreadsheet, Bacciarini would still have prosecuted and taken this matter to trial based on the statement of Aceves and Report of Cassabon & Associates.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DISPUTED.

*DUF 68:* The only post-verdict contract Bacciarini had with Robert Abbate was when he called Abbate and told him about the not guilty verdict, to which Abbate had no specific reaction.

*Plaintiff's Response:* UNDISPUTED.

*DUF 69:* Bacciarini never spoke to any member of the Abbate family in relation to the criminal matter other than Robert Abbate.

*Plaintiff's Response:* UNDISPUTED.

*DUF 70:* Bacciarini did not know Robert Abbate, or any Abbate family member, prior to becoming involved in the criminal action.

*Plaintiff's Response:* UNDISPUTED.

*DUF 71:* Bacciarini was not aware of any relationship between Gordon Spencer

and Robert Abbate or the Abbate family during the criminal action. Supporting Evidence: Exh. I, Bacciarini Depo., 39:11–19.

*Plaintiff's Response:* Disputed. Plaintiff saw Abbate, Bacciarini and Spencer having conversations outside of court in connection with her court appearances. Plaintiff's Deposition, p. 32–34.

*Court Ruling:* DUF 71 is UNDISPUTED. Plaintiff merely saw the District Attorney, the prosecutor and Robert Abbate conversing outside the courtroom during her criminal trial. Plaintiff does not testify as to the content of those conversations; this evidence does not contradict Bacciarini's testimony that he was unaware of any relationship between Spencer and Abbate during the criminal trial.

*DUF 72:* Bacciarini was never told by anyone to prosecute the case differently because the victim was Robert Abbate or a member of the Abbate family. Supporting Evidence: Exh. I, Bacciarini Depo., 70:19–22; 71:7–10, 67:8–17.

*Plaintiff's Response:* Disputed, as there is 'ample circumstantial evidence that this case was not handled in the normal manner. Disputed. Bacciarini testified that he did not know why Abbate's complaint did not go to the Merced Police Department first. Bacciarini Deposition, p. 55. Hutton acknowledges that Abbate could have taken his allegations to the Merced Police Department instead of the District Attorney's Office. Hutton Deposition, p. 45. Moreover, the District Attorney's Office has directed similar potential cases to the Merced PD. See Exhibit B, Email communication from the Merced DA's Office re: a potential embezzlement case in the City of Merced. Spencer could not provide only two examples of embezzlement cases in the last five years of his tenure where his officer was the lead investigating agency. Spencer Deposition, p. 35–38.

*Court Ruling:* DUF 72 is UNDISPUTED. Plaintiff's evidence relates to the investigation of Abbate's complaint, not to the prosecution of the criminal charge eventually brought against her. Plaintiff presents no evidence of what statement, if any, was made to Bacciarini about prosecuting the case.

*DUF 73:* No one ever told Bacciarini to fabricate evidence to support the charges against Fenters. Supporting Evidence: Exh. I, Bacciarini Depo., 71:3–6, 73:2–4.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 10.

*Court Ruling:* DUF 73 is UNDISPUTED. Plaintiff's evidence pertains to the investigation conducted by Abbate and Hutton and does not evidence that Bacciarini was told to fabricate evidence to support the criminal charge against Plaintiff.

*DUF 74:* Abbate did not fabricate any Pay Point Reports to show embezzlement.

*Plaintiff's Response:* Disputed, as the evidence shows the bad faith of the spreadsheet document. Until the time the Cassabon firm was retained after the preliminary hearing, the District Attorney's Office relied on Abbate to review the financial information pertinent to the case against Fenters. Hutton Deposition, p. 33–34. Abbate's financial analysis was one of the reasons that Hutton submitted the case against Fenters for filing. Hutton Deposition, p. 82. Indeed, the Abbate spreadsheet was the only financial evidence then available in a prospective financial crime case. Hutton Deposition, pp. 82–83. Abbate conceded on cross-examination at the preliminary hearing that the voids attributable to Fenters were overstated in his spreadsheet. See Preliminary Hearing Transcript, pp. 52–59. Abbate also conceded that certain entries in his spread-

sheet appeared to be entered wrongly, and he spent no time reviewing the initial draft spreadsheet he prepared. See Preliminary hearing Transcript, pp. 60–61; Abbate Deposition, p. 60, 64. Abbate also attributed certain shifts to Fenters, even though the underlying pay point reports did not contain her genuine signature. See Trial Transcript, pp. 491–492. Abbate also did not provide any tax returns or other financial documents reflecting a drop in revenues during the time when the embezzlement was allegedly occurring. Hutton Deposition, p. 22. Abbate also did not provide Hutton with any videotapes from the register area. Hutton Deposition, p. 23. This is further circumstantial evidence of his intent to conceal the truth and unduly influence the criminal proceedings against Fenters.

*Court Ruling:* DISPUTED. This is a matter for resolution by the trier of fact.

*DUF 75:* Plaintiff's Accounting Expert, John Bettencourt ("Bettencourt"), testified that he has performed no analysis on the Abbate Spreadsheet since the preliminary hearing because it was ruled inadmissible.

*Plaintiff's Response:* UNDISPUTED.

*DUF 76:* Bettencourt testified that he found numerical error in the Abbate Spreadsheet which may all be innocent mistakes. Supporting Evidence: Exh. U, Bettancourt Depo., 56:3–6, 75:10–77:11.

*Plaintiff's Response:* Disputed. In Bettencourt's expert report, he declared that the spreadsheet provided by defendant Robert Abbate and the work product of Cassabon were indicative of false, fabricated and/or misleading work product. Bettencourt opined that the defendants' accounting work was not merely substandard or negligent but instead is reflective of false, fabricated, and/or misleading work. See Bettencourt Report, Exhibit A. In his deposition, Bettencourt confirmed his report and further testified that Abbate's and Cassabon's work product was mislead-

ing and misstated the evidence. See Bettencourt Deposition, pp. 33, 38, 78, 97. Bettencourt testified that it was not reasonable or in good faith actions to attribute all of the voids on a particular shift to a specific employee. Bettencourt Deposition, p. 157–158, 161. Both Abbate's spreadsheet and Fung's report were similar in this respect. Bettencourt Deposition, p. 160, 161. Bettencourt is of the opinion that these actions could raise an inference of bad faith that could be found by a jury. Bettencourt Deposition, p. 163.

*Court Ruling:* DISPUTED.

*DUF 77:* Bettencourt testified that he is offering an opinion that Abbate made numerical errors in the Abbate Spreadsheet, but he is not offering an opinion that Abbate deliberately fabricated the Spreadsheet. Supporting Evidence: Exh. U, Bettancourt Depo., 99:2–19, 123:5–10, 123:5–125:12.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 76.

*Court Ruling:* DISPUTED.

*DUF 78:* Bettencourt has no knowledge that Abbate deliberately fabricated any numbers in his analysis or spreadsheet. Supporting Evidence: Exh. U, Bettancourt Depo. 99:2–19, 114:1–5, 146:10–20, Exh. E., Plaintiff Depo. 68:23–69:3.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 76.

*Court Ruling:* DISPUTED.

*DUF 79:* Bettencourt did not perform any analysis of the errors in the Abbate Spreadsheet that would show a pattern of bias indicating that Abbate was attempting to falsify charges of embezzlement against Fenters. Supporting Evidence: Exh. U, Bettancourt Depo., 101:3–108:13, 109:5–110:5, 126:16–128:7.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 76.

*Court Ruling:* DISPUTED.

*DUF 80:* Bettencourt did not perform any analysis of the materiality of the errors in the Abbate Spreadsheet that would indicate that the errors had a greater tendency to show embezzlement. Supporting Evidence: Exh. U, Bettancourt Depo., 101:3–108:13, 109:5–111:3, 115:9–117:23, 118:16–119:5.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 76.

*Court Ruling:* DISPUTED.

*DUF 81:* Bettencourt did not perform any analysis to determine if a different conclusion should have been reached as to embezzlement if the purported errors made by Abbate had been corrected in the Abbate Spreadsheet. Supporting Evidence: Exh. U, Bettancourt Depo., 126:16–128:7, 129:1–5.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 76.

*Court Ruling:* DUF 81 is UNDISPUTED; Plaintiff's evidence does not contradict Bettancourt's deposition testimony.

*DUF 82:* Bettencourt did not perform any analysis on whether Abbate's purported error of listing no mid-shift, where there was a dual shift, had a material impact or was indicative of misleading work. Supporting Evidence: Exh. U, Bettancourt Depo., 102:9–103:24.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 76.

*Court Ruling:* DUF 82 is UNDISPUTED; Plaintiff's evidence does not contradict Bettancourt's deposition testimony.

*DUF 83:* Bettencourt testified that he has not formed an opinion as to whether the Abbate Spreadsheet was false or fabricated because that goes to state of mind. Supporting Evidence: Exh. U, Bettancourt Depo., 96:6–97:17.

*Plaintiff's Response:* Disputed on identical grounds stated in response to DUF 76.

*Court Ruling:* DUF 83 is UNDISPUTED; Plaintiff's evidence does not contradict Bettancourt's deposition testimony.

2. *Issue No. 2: Plaintiff Cannot Maintain a Claim for Malicious Prosecution Because She Cannot Meet the Requisite Elements.*

*DUF 84:* The Abbate Defendants incorporate by reference Fact Nos. 1–83 and 87–103.

*Plaintiff's Responses and Court Rulings:* See supra.

3. *Issue No. 3: Plaintiff Cannot Maintain a Claim for Violation of Civil Code § 52.1 Because She Cannot Meet the Requisite Elements.*

*DUF 85:* The Abbate Defendants incorporate by reference Fact Nos. 1–83.

*Plaintiff's Responses and Court Rulings:* See supra.

*DUF 86:* Abbate never threatened, coerced, or intimidated Fenters. Supporting Evidence: Exh. E, Plaintiff Depo., 156:2–6; Exh. F, Aceves Depo., 144:14–22; Exh. U, Bettancourt Depo., 138:24–139:11; Exh. X, Plaintiff's Responses to Robert Abbate's Special Interrogatories, Set One, No. 5.

*Plaintiff's Response:* Disputed. As a result of Abbate's and the other defendants' misconduct, Fenters was threatened with the prospect of conviction and incarceration. See Plaintiff's Deposition, p. 401–402. Indeed, the lead prosecutor testified that he would have indeed sought to incarcerate and seek full restitution

against Fenters had she been convicted. See Bacciarini Deposition, p. 64–66.

*Court Ruling:* UNDISPUTED. There is no direct or circumstantial evidence that Abbate threatened or coerced Plaintiff.

4. *Issue No. 4: Plaintiff Cannot Maintain a Claim for Violation of 29 U.S.C. § 215 Because She Cannot Meet the Requisite Elements.*

*DUF 87:* The Abbate Defendants incorporate by reference Fact Nos. 1–87 and 99–103.

*Plaintiff's Responses and Court Rulings:* See supra.

*DUF 88:* Abbate brought a complaint to the District Attorney's office based on a good faith suspicion and belief that Fenters had been stealing from Yosemite Chevron. Supporting Evidence: Exh. A, Abbate Decl. ¶ 6; Exh. B, Bettancourt Trial Testimony, 573:6–10.

*Plaintiff's Response:* Disputed on grounds stated in response to DUF 10.

*Court Ruling:* Disputed.

*DUF 89:* Abbate never consulted with an attorney about potential work-related complaints that could be brought by Plaintiff. Supporting Evidence: Exh. A, Abbate Decl. ¶ 10.

*Plaintiff's Response:* Disputed. Abbate was not permitted to testify on this subject during his deposition on privilege grounds and must now abide by that assertion of privilege. See Abbate Deposition, p. 140. A party can not invoke and waive privileges at his convenience, thereby using them as both swords and shields in the same case. See *United States v. Rylander,* 460 U.S. 752, 759, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983); *Williams v. Florida,* 399 U.S. 78, 83–84, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

*Court Ruling:* DISPUTED.

*DUF 90:* Fenters admitted her allegations, that Abbate's motive to accuse her of embezzlement was because of her potential harassment lawsuit, is based on speculation. Supporting Evidence: Exh. E, Plaintiff Depo. 162:6–11, 185:15–19, 186:10–189:5.

*Plaintiff's Response:* Disputed, as Fenters clarified in her deposition testimony that she was only testifying based on her personal knowledge and did not intend to characterize the entirety of her evidence. See Plaintiff's Deposition, p. 400–401. The evidence set forth above shows Abbate's bad faith motive independent of what Fenters personally has knowledge of.

*Court Ruling:* DISPUTED.

*DUF 91:* Fenters did not have any conversations with Abbate about her feeling that Ed Montes was harassing her at work. Supporting Evidence: Exh. E, Plaintiff Depo., 191;16–19.

*Plaintiff's Response:* Disputed. Fenters told Abbate about Montes' misconduct, and Abbate spoke with Montes about it thereafter. Abbate Deposition, p. 70–71. Abbate claims he thereafter did his best to ensure that Montes and Fenters did not work the same shift. Abbate Deposition, p. 72.

*Court Ruling:* DUF 91 is UNDISPUTED. Plaintiff testified that she had no conversations with Abbate that Montes was harassing Plaintiff at work; Plaintiff's evidence relates to an incident reported by Plaintiff to Abbate that occurred at Montes' residence.

*DUF 92:* There is no evidence that Abbate was aware that Fenters had made any complaints about Montes or any other employees harassing her at work. Supporting Evidence: Exh. E, Plaintiff Depo., 191:16–19.

*Plaintiff's Response:* Disputed on grounds stated in response to DUF 91.

*Court Ruling:* DUF 92 is UNDISPUTED. Plaintiff testified that she had no conversations with Abbate that Montes was harassing Plaintiff at work; Plaintiff's evidence relates to an incident reported by Plaintiff to Abbate that occurred at Montes' residence.

*DUF 93:* Fenters never mentioned to Abbate that she intended to bring a lawsuit against him. Supporting Evidence: Exh. E, Plaintiff Depo., 163:8–14.

*Plaintiff's Response:* Disputed, as Fenters complained about overtime, salary and sexual harassment issues to Abbate and Yosemite management, even if she made no specific threat of a lawsuit. See Plaintiff's Deposition, p. 164–166, 167–168, 169–170, 172–174, 177–178, 179–180, 181–183, 188–192.

*Court Ruling:* DUF 93 is UNDISPUTED; Plaintiff never told Abbate that she intended to file a lawsuit against him.

*DUF 94:* Fenters never mentioned to any Yosemite Chevron employee that she intended to bring a lawsuit against Abbate or Yosemite Chevron.

*Plaintiff's Response:* Disputed on grounds stated in response to DUF 93.

*Court Ruling:* DUF 94 is UNDISPUTED for the same reason as DUF 93.

*DUF 95:* Bacciarini never heard or talked to Bruce Souza or Abbate about any potential civil lawsuit against Abbate by Fenters.

*Plaintiff's Response:* UNDISPUTED.

*DUF 96:* Aceves testified that Fenters never complained to him about specific problems with working at Yosemite Chevron. Supporting Evidence: Exh. F, Aceves Depo., 34:24–35:24.

*Plaintiff's Response:* Disputed, as this fact is of no significance. Aceves and Fenters were merely coworkers and had no contact outside of the workplace. See Aceves Deposition, pp. 23–27. There is nothing suggesting that Fenters would have told such a person about the subject matters at issue.

*Court Ruling:* DUF 96 is UNDISPUTED as Plaintiff admits no such conversation.

*DUF 97:* Aceves testified that Fenters never complained to him about any of the coworkers at Yosemite Chevron.

*Plaintiff's Response:* Disputed on grounds stated in response to DUF 96.

*Court Ruling:* DUF 97 is UNDISPUTED.

5. *Issue No. 5: Plaintiff Cannot Maintain a Claim for Violation of 29 U.S.C. § 201 Because She Cannot Meet the Requisite Elements.*

*DUF 98:* The Abbate Defendants incorporate by reference Fact Nos. 1–98.

*Plaintiff's Responses and Court Rulings:* See supra.

*DUF 99:* Yosemite Chevron paid all required overtime under the laws of California based on the time cards submitted by Fenters. Supporting Evidence: Exh. A, Abbate Decl. ¶ 11.

*Plaintiff's Response:* Disputed. Fenters testified that she was not paid time and a half for overtime, even if she could not at her deposition provide a calculation as to that time. See Plaintiff's Deposition, p. 305, 355–356.

*Court Ruling:* DISPUTED.

*DUF 100:* Fenters has no evidence to show that Yosemite Chevron's timecards are inaccurate. Supporting Evidence: Exh. E, Plaintiff Depo. 349:16–355:10.

*Plaintiff's Response:* Disputed on grounds stated in response to DUF 99.

*Court Ruling:* DISPUTED as per Plaintiff's deposition testimony.

*DUF 101:* At deposition, Fenters could not identify any specific date that she was not paid for overtime. Exh. E, Plaintiff Depo., 163:24–164:18, 349:16–355:10, 355:20–357:3.

*Plaintiff's Response:* Disputed on grounds stated in response to DUF 99.

*Court Ruling:* DUF 101 is UNDISPUTED.

*DUF 102:* At deposition, Fenters could not identify any specific hour of overtime that she has not been paid for by Yosemite Chevron. Supporting Evidence: Exh. E, Plaintiff Depo., 305:1–18, 349:16–355:10, 355:20–357:3.

*Plaintiff's Response:* Disputed on grounds stated in response to DUF 99.

*Court Ruling:* DUF 102 is UNDISPUTED.

*DUF 103:* At deposition, Fenters testified that there could be zero hours of overtime that have been unpaid. Supporting Evidence: Exh. E, Plaintiff Depo., 305:1–18.

*Plaintiff's Response:* Disputed on grounds stated in response to DUF 99.

*Court Ruling:* DUF 103 is UNDISPUTED; Plaintiff so testified at her deposition.

## D. *FIRST CLAIM FOR RELIEF FOR VIOLATION OF SECTION 1983.*

The first claim for relief in the FAC alleges violations of 42 U.S.C. § 1983 against all Defendants:

> 34. The defendants' intentional and reckless acts, as described above, constitute a deprivation of Tiffany's ... rights under the Fourth Amendment not to have her liberty restricted without legal basis, to be arrested without probable

cause, and not to be prosecuted maliciously without probable cause. With respect to these constitutional violations, as alleged hereinabove, defendants Yosemite Chevron, Abbco, Abbate, Fung, McIlhatton, and Cassabon were acting in joint activity with and/or conspiring with Spencer and Hutton.

The Abbate Defendants move for summary judgment on the grounds that the District Attorney's Office acted with independent discretion to prosecute; that Plaintiff cannot show that Abbate controlled the investigation or decision to prosecute; and that the Abbate Defendants are entitled to absolute witness immunity.

### 1. *Smiddy Presumption.*

■ The Ninth Circuit has long recognized that "[f]iling a criminal complaint immunizes investigating officers ... from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." *Smiddy v. Varney,* 665 F.2d 261, 266 (9th Cir.1981) (*Smiddy I*). In *Smiddy v. Varney,* 803 F.2d 1469, 1471 (9th Cir.1986) (*Smiddy II*), the Ninth Circuit held that Smiddy had not overcome this presumption because he produced no evidence "that the district attorney was subjected to unreasonable pressure by the police officers, or that the officers knowingly withheld relevant information with the intent to harm [him], or that the officers knowingly supplied false information."[2] As explained in *Newman v. County of Orange,* 457 F.3d 991, 994 (9th Cir.2006), *cert. denied,* 549 U.S. 1253, 127 S.Ct. 1383, 167 L.Ed.2d 161 (2007):

---

**2.** Defendants cited *Alvarez–Machain v. United States,* 331 F.3d 604 (9th Cir.2003), as authority supporting their claim for summary judgment. The Ninth Circuit's decision was reversed by the Supreme Court in *Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

Our later cases further explained the types of evidence necessary to overcome the presumption. In *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988), we affirmed an award of damages that included attorneys' fees incurred defending against criminal charges of which the plaintiffs were acquitted. The prosecutor based the decision to prosecute solely on the information contained in the officers' reports, but the plaintiffs highlighted striking omissions in those reports as well as the fact that the officers themselves offered conflicting stories. *Id.* On the basis of such evidence, '[t]he jury was entitled to find … that [the officers] procured the filing of the criminal complaint by making misrepresentations to the prosecuting attorney.' *Id.*.

In *Barlow v. Ground*, 943 F.2d 1132 (9th Cir.1991), … we held that a civil rights plaintiff seeking attorneys' fees had also produced sufficient evidence to overcome the *Smiddy* presumption. There … the prosecutor relied solely on the arresting officers' reports, which omitted critical information … Further, an independent witness corroborated at least part of the plaintiff's version of events and the officers' accounts conflicted ….

*In contrast, we have stated that a plaintiff's account of* the incident in question, by itself, does not overcome the presumption of independent judgment. *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir.1994).

*See also Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir.2008) (presumption "may be rebutted if the plaintiff shows that the independence of the prosecutor's judgment has been compromised").

 Plaintiff argues that summary judgment is not appropriate because of evidence that the Abbate Defendants fabricated allegations against Plaintiff and brought them to the District Attorney's Office through "unconventional channels" based on a preexisting personal relationship between the Abbate family and Defendant Spencer; that Aceves was coerced by Abbate and Defendant Hutton into falsely implicating Plaintiff; that Abbate, "and to a lesser extent, Hutton," withheld exculpatory information in the spreadsheet and reports that caused the prosecution against Plaintiff to be initiated; and that these incidents of misconduct followed closely in time Plaintiff's resignation after complaining about wage and hour, reimbursement, and sexual harassment issues.

Defendants reply that the evidence shows that Abbate, before reporting suspected embezzlement to law enforcement, caught Aceves stealing money from Yosemite Chevron by falsely voiding transactions. Aceves testified that he implicated Plaintiff when he was first caught stealing because he wanted to put the blame on someone else, not because of any threats or coercion, and that he was not under any threats or coercion when he later implicated Plaintiff during the June 4, 2003 meeting with Abbate and Defendant Hutton. Defendants argue that the only evidence that can be offered of Abbate's involvement in the criminal case was the initial reporting of the suspected crime, providing business records, participating in Defendant Hutton's interview of Aceves, and his testimony at the preliminary hearing. The fact that Abbate prepared a spreadsheet with a record of voided transactions that Plaintiff's expert opines contained numerical errors does not raise an inference of liability under Section 1983. Defendants contend that Plaintiff does not refute that Abbate's spreadsheet was ruled inadmissible at the preliminary hearing, that the prosecuting attorney did not rely on Abbate's spreadsheet during the criminal trial, and that the District Attorney's Office retained Cassabon & Associates after the preliminary hearing to evaluate Yo-

semite Chevron's business records and that Victor Fung was the only witness to testify at the trial. Defendants argue that there is no evidence to suggest that the District Attorney's Office proceeded with the prosecution or trial due to pressure from Abbate or based on fabricated evidence. Defendants refer to the prosecuting attorney's testimony that he would have prosecuted Plaintiff even if Abbate had not prepared the spreadsheet.

The Abbate Defendants' motion for summary judgment on the ground of the *Smiddy* presumption is DENIED.

### 2. *Control of Investigation or Prosecution.*

■ Defendants argue that summary judgment is appropriate because Plaintiff cannot show that the Abbate Defendants controlled the District Attorney's Office investigation or the prosecution of Plaintiff.

The Abbate Defendants cite *Arnold v. Intern. Business Machines*, 637 F.2d 1350 (9th Cir.1981). There, Arnold brought an action against IBM and various of its employees for alleged violations of Arnold's civil rights. The Ninth Circuit affirmed the grant of summary judgment for defendants, holding that in the absence of evidence that IBM and its employees controlled the police investigation, which led to Arnold's arrest on charges of stealing corporate documents and trade secrets and the search of Arnold's residence, the involvement of IBM and the employees in the investigation was not the proximate cause of Arnold's injuries and Arnold could not recover under statutes authorizing civil actions for deprivation of rights under color of law and conspiracy to defraud persons of their civil rights. In so holding, the Ninth Circuit stated:

> ... It is clear that 'but for' IBM's involvement, there would have been no investigation, and Arnold never would have been arrested or indicted or had his residence searched.
>
> There is nothing in the record, however, to indicate that defendants exerted any control over the decision making of the Task Force. Deputy District Attorney Bender testified that the Task Force used the information supplied by IBM to determine which companies might be in possession of IBM documents, but that the Task Force conducted a full and independent investigation. Bender and Sergeant Frechette both testified that neither Callahan nor IBM controlled the investigation. Arnold has pointed to no facts that indicate that IBM in any way controlled the police investigation or that the Task Force was in any sense a mere conduit for carrying out IBM's will.

637 F.2d at 1357. The Abbate Defendants also cite *Mann v. City of Tucson Dept. of Police*, 782 F.2d 790, 793 (9th Cir.1986), a case involving dismissal, wherein the Ninth Circuit held in pertinent part:

> [D]ismissal of these claims against defendants other than the Tucson police defendants was proper for other reasons. The substantive constitutional violation charged consisted of two unlawful searches of Mann's apartment. The search was performed by the Tucson police officers. All but two of the other defendants are private persons who allegedly instigated, aided, or participated in the searches. Under *Arnold v. IBM Corp.*, ... in order to establish the requisite proximate cause between the conduct of private persons and searches in violation of section 1983, a plaintiff must prove the private individuals exercised control over the decisionmaking in a police investigation. Mann has failed to allege that these other defendants controlled the investigation or directed that the searches be conducted, and the facts

alleged would not support such a claim. For this reason, the section 1983 claims against these private defendants were properly dismissed.

782 F.2d at 793.

In *King v. Massarweh,* 782 F.2d 825, 829 (9th Cir.1986), the district court's dismissal of a Section 1983 claim against the defendant landlord was affirmed. Citing *Arnold,* the Ninth Circuit affirmed:

> ... Massarweh's involvement with the police is even more attenuated [than the involvement of IBM in *Arnold* ]. Massarweh's sole act was to call the police. Nothing in the record indicates that Massarweh exerted any control over the officers' decision to search appellants' apartments or to arrest the appellants. On the facts alleged by the appellants, Massarweh sought the appellants' removal as trespassers, but the police conduct that allegedly violated the plaintiffs' Fourth Amendment rights took place on the officers' own initiative.

782 F.2d at 829. In *Franklin v. Fox,* 312 F.3d 423 (9th Cir.2002), the Ninth Circuit affirmed the district court's grant of summary judgment in favor of Franklin–Lipsker, the daughter of plaintiff, who plaintiff alleged conspired with state prosecutors in violation of his civil rights:

> Furthermore, to the extent that Franking aims to hold his daughter responsible for [District Attorney] Murray's facilitation of the visit or trial prosecutor Tipton's use of his jailhouse silence against him at trial, his claim fails. In order for a private individual to be liable for a § 1983 violation when a state actor commits the challenged conduct, the plaintiff must establish that the private individual was the proximate cause of the violation . . . .
>
> *Arnold* ... is instructive. There a task force including law enforcement officials, the district attorney, and an IBM security manager investigated trade secret leaks from within IBM. After his arrest and indictment and the search of his home, the plaintiff sued IBM under § 1983 based on his involvement with the investigation. We held that, although IBM provided the task force with its security manager, information, funding, and grand jury witnesses, the company was not the proximate cause of the plaintiff's injuries because it did not direct the task force to take action against him . . . .
>
> Here, there is no evidence that Murray and Tipton were under Franklin–Lipsker's control or that they failed to exercise their own independent judgment when they violated Franklin's rights. Murray's response to Franklin–Lipsker's request for help to visit her father and to offer her advise as to the advisability of a visit did not turn Franklin–Lipsker into a facilitator or a cause of the state's violation. With respect to the violation at trial, one of the bases upon which Franklin's conviction was overturned, there is no evidence that Franklin–Lipsker was even aware of Tipton's decision to allude to Franklin's silence during the jail visit as evidence of guilt.

312 F.3d at 445–446. In *Crowe v. County of San Diego,* the district court granted summary judgment for defendant Blum, a psychologist in private practice who consulted with the Escondido Police Department during the murder investigation because Blum did not participate in the arrests of the boys or the searches of their residences and "there is absolutely no evidence that defendant Blum had any control over the other defendants' decision to conduct the challenged searches and arrests." 303 F.Supp.2d 1050, 1063–1064 (S.D.Cal.2004).

Plaintiff responds by citing *Allen v. Woodford,* 2006 WL 1748587 (E.D.Cal. 2006):

"Actions taken by a private individual may be "under color of state law" where there is a significant state involvement in the action." *Franklin v. Fox,* 312 F.3d 423, 444 (9th Cir.2002); *Johnson v. Knowles,* 113 F.3d 1114, 1118 (9th Cir. 1997) ... The extent of state involvement in the action is a question of fact ... The Supreme Court has articulated four distinct tests for determining whether the actions of private individuals amount to state action: 1) the public function test; 2) the joint action test; 3) the state compulsion test; and 4) the governmental nexus test. *Franklin,* 312 F.3d at 444–445 ....

Under the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been 'traditionally the exclusive prerogative of the state.' ... Under the joint action test, state action is found where a private person is a 'willful participant in joint activity with the State or its agents' that effects a constitutional deprivation ... Under the state compulsion test, a private party is fairly characterized as a state actor when the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State ... Lastly, under the governmental nexus test, the issue is whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself ....

While these factors are helpful in determining the significance of state involvement, 'there is no specific formula for defining state action.' ... The extent of state involvement remains a factual inquiry. 'Only by sifting facts and weighing circumstances can the non-obvious involvement of the state in private conduct be attributed its true significance.'

Plaintiff argues that evidence of Abbate's involvement in the criminal investigation suffices to raise a question of fact that he was a state actor under any of the four distinct tests.

The parties are talking apples and oranges. Defendants move for summary judgment that Abbate did not control the investigation, i.e., he was not the proximate cause of the decision to bring criminal charges against Plaintiff. The Abbate Spreadsheet was ruled inadmissible at the preliminary hearing and played no part in the decision by the Superior Court to hold Plaintiff to answer. Although Plaintiff makes much of Aceves' trial testimony, Aceves testified at his deposition that he lied to Abbate and Hutton about Plaintiff's involvement in the embezzlement and did not recant his statements until the trial. There is evidence that Hutton's investigation may have been incomplete and there is evidence that Hutton relied on Abbate to provide the financial evidence, i.e., the Abbate Spreadsheet, to substantiate the alleged embezzlement. There is evidence that Abbate provided misleading and inaccurate information to Hutton and that Abbate encouraged the prosecution. The link between Abbate and the prosecutor is less clear. This is an extremely close call better resolved by the trier of fact.

Summary judgment for the Abbate Defendants on the issue whether they controlled the District Attorney's investigation or prosecution of Plaintiff is DENIED.

### 3. *Witness Immunity.*

■ Defendants move for summary judgment as to Plaintiff's cause of action for violation of Section 1983 on the grounds of absolute witness immunity.

In *Briscoe v. LaHue*, 460 U.S. 325, 326, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the Supreme Court held that a witness has absolute immunity from liability for civil damages under Section 1983 for giving perjured testimony at trial. In *Franklin v. Terr*, 201 F.3d 1098 (9th Cir.2000), the Ninth Circuit applied *Briscoe*'s immunity to Terr, a psychiatrist called by the prosecution who testified in Franklin's criminal trial based on charges by his daughter, Franklin–Lipsker, that Franklin had murdered a childhood friend twenty years earlier, and who was later sued by Franklin under Section 1983. Franklin alleged that Terr had conspired with others to present perjured testimony at the criminal trial. The Ninth Circuit held:

> In the instant case, Franklin is attempting to circumvent Terr's absolute witness immunity by alleging that Terr conspired with others to present false testimony. We are persuaded that allowing a plaintiff to circumvent the *Briscoe* rule by alleging a conspiracy to present false testimony would undermine the purposes served by granting witnesses absolute immunity from liability for damages under § 1983. Absolute witness immunity is based on the policy of protecting the judicial process and is 'necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.' ... As the Court stated in *Briscoe*, '[a] witness's apprehension of subsequent damages liability might induce two forms of self censorship. First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability.' ... Moreover, as the district court correctly observed, '[a]ny other holding would eviscerate absolute immunity since a witness rarely prepares her testimony on her own.'

Franklin alleges that Terr conspired with Franklin–Lipsker by interviewing her before Franklin's trial and by then incorporating information obtained from those interviews into her own testimony. Franklin also alleges that Terr provided Franklin–Lipsker 'with a description of the sort of details that would make her testimony more persuasive, which Franklin–Lipsker then incorporated into her continually evolving "recollection" of the Nason murder.' The ostensible purpose of this conspiracy was to ensure that one person's testimony did not contradict the other's testimony. But because Terr's alleged conspiratorial behavior is inextricably tied to her testimony, we find that she is immune from damages. We are not presented with, and do not decide, the question whether § 1983 provides a cause of action against a defendant who conspired to present the perjured testimony of another but did not testify as a witness herself.

201 F.3d at 1101–1102. *See also Paine v. City of Lompoc*, 265 F.3d 975, 983 (9th Cir.2001):

> Our cases and *Spurlock* [*v. Satterfield*, 167 F.3d 995 (6th Cir.1999) ], demonstrate that ... absolute witness immunity does not shield an out-of-court, pretrial conspiracy to engage in non-testimonial acts such as fabricating or suppressing physical or documentary evidence of suppressing the identities of potential witnesses.

In *Gray v. Poole*, 275 F.3d 1113 (D.C.Cir.2002), a social worker submitted a statement to the court in connection with a child neglect action. The District of Columbia Circuit held that Poole was entitled to absolute witness immunity, concluding that "[i]t does not matter whether Poole's sworn statement was given in oral or written form; what matters is that her state-

ment was the equivalent of sworn testimony in a judicial proceeding." 275 F.3d at 1118; *see also Morstad v. Dept. of Corrections & Rehab.*, 147 F.3d 741, 744 (8th Cir.1998) ("Because the court directed Veenestra to evaluate Morstad and to testify at Morstad's probation revocation hearing, we conclude that Veenstra was performing functions essential to the judicial process ... and affirm the district court's determination that Veenstra was entitled to absolute immunity.") In *Buckley v. Fitzsimmons*, 919 F.2d 1230 (7th Cir.1990), *reversed on other grounds*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), the Seventh Circuit addressed whether three expert witnesses had absolute immunity for their pretrial activities of evaluating the bootprint, writing reports, discussing the case with prosecutors, and preparing to testify. 919 F.2d at 1244–1245. The Seventh Circuit held:

> ... We agree with the district court that they do. *Briscoe* holds that the presentation of testimony may not be the basis of liability, even if the witness deliberately misleads the court. It would be a hollow immunity if the aggrieved party could turn around and say, in effect: 'True, your *delivery* of bad testimony is immunized, but preparing to deliver that testimony is not, so I can litigate the substance of your testimony.' Substance is exactly what *Briscoe* puts off limits.
>
> As expert could violate a suspect's rights independently of the litigation. The expert might, for example, break into the suspect's home to obtain samples for analysis. Absolute immunity would not apply to that theft, for the same reason it does not apply to prosecutorial infliction of punishment without trial. A nontestimonial expert could violate a suspect's rights by 'cooking' a laboratory report in a way that misleads the testimonial experts. Experts, like the police, 'cannot hide behind [the immunity of]

the officials whom they have defrauded.' ... But nothing in the complaint suggests that the three experts hid evidence, as opposed to misinterpreting it. Discussions between the prosecutors and the experts violated none of Buckley's rights. Preparing to commit slander or perjury is not actionable. The testimony itself is covered by immunity. Buckley makes it clear that the testimony is the real gravamen of his complaint. Olsen, he submits, 'wrongfully changed his initial opinion'; Robbins was an 'utterly disreputable witness-for-hire.' Maybe so, but cross-examination rather than a suit for damages is the right way to establish these things. Junk science is a plague of contemporary litigation, but the peddlers of poorly supported theories do not expose themselves to liability by doing research out of court or appearing in more than one case. *White v. Frank*, 855 F.2d 956 (2nd Cir. 1988) holds that Briscoe does not apply to 'complaining witnesses'. Buckley contends that the three experts are in this category, because but for their opinions the State's Attorney would not have obtained an indictment. The parallel is not apt. None of the experts invented the report of a crime or brought the fable to the state's attention. Jeanine Nicarico is dead. Each expert was brought into the case by the prosecutors, who sought to evaluate the strength of the evidence against Buckley. We therefore need not decide whether to follow *White*.

919 F.2d at 1245.

Defendants argue that summary judgment on this ground is appropriate because there is no evidence that the Abbate Defendants created false ledgers, receipts, daily register reports or any other records to set up Plaintiff. All Plaintiff will be able to argue is that Abbate provided false

testimony as the complaining witness, which is insufficient to circumvent *Briscoe*.

Plaintiff refers to the Order denying the Abbate Defendants' motion to dismiss the Complaint, that "[t]he Abbate Defendants are not entitled to dismissal of the First Cause of Action on this ground to the extent that the Complaint can be construed as alleging that the Abbate Defendants fabricated evidence or conspired to do so." Plaintiff contends:

> There is evidence that the Abbate defendants fabricated allegations against Fenters and brought them to the District Attorney's Office through unconventional channels based on a preexisting personal relationship between the Abate [sic] family and defendant Spencer. The record also suggests that Aceves was coerced by Abbate and Hutton into falsely implicating Fenters and that these two defendants acted in bad faith in doing so. The evidence also shows that Abbate, and, to a lesser extent, Hutton, withheld exculpatory information in the spreadsheet and reports that caused the prosecution against Fenters to be initiated. Finally, the evidence shows that these incidents of misconduct closely in time followed Fenters' resignation after complaining about wage and hour, reimbursement, and sexual harassment issues. These actions are more than sufficient to deprive Abbate and the related entity defendants of witness immunity.

There is no evidence that Abbate *fabricated* any evidence against Plaintiff. The evidence is that the financial support in the Abate Spreadsheet for the alleged embezzlement was incomplete and did not account for certain factors that Plaintiff's expert considers necessary to consider. There is some evidence that Abbate may have withheld exculpatory information; he provided all of the business records to Hutton and, eventually, to the Cassabon

Defendants. Aceves' deposition testimony and the record of his interview with Abbate and Hutton establishes that Aceves lied to Abbate and Hutton and that he was not coerced or intimidated by Abbate in any way. Aceves testified at his deposition that he did not tell Abbate or Hutton about his lies and that he only recanted his statements during the trial. However, there is evidence that Abbate did not provide complete information to Hutton in his investigation. Drawing inferences in favor of Plaintiff, Abbate had a motive to discredit and deter Plaintiff. He sought to influence Hutton. If Bettancourt's testimony is believed, Abbate's incomplete and inaccurate information facilitated what Bettancourt opines was a false, misleading or fabricated financial analysis by Fung. The Abbate Defendants' motion for summary judgment on the ground of absolute witness immunity is DENIED.

### E. *CONSPIRACY.*

██ Defendants move for summary judgment on the ground that Plaintiff has no evidence to support her claim that the Abbate Defendants conspired with the other defendants to violate Plaintiff's constitutional rights.

██ To prove a conspiracy, Plaintiff must show "an agreement or 'meeting of the minds' to violate constitutional rights." *Franklin v. Fox, supra*, 312 F.3d at 441. Each individual does not need to know the plan; sharing the common purpose of the conspiracy is sufficient. *Id.* A private individual may be liable if he conspired with a state actor. *Id.*

"The defendants must have, by some concerted action, intended to accomplish some unlawful objective for the purpose of harming another which results in damage." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir.1999). This agreement or meeting of the minds

may be inferred on the basis of circumstantial evidence, such as the actions of the defendants. *Id.* A showing that defendants committed acts that 'are unlikely to have been undertaken without an agreement' may support the inference of a conspiracy. *Id.* Nonetheless, Plaintiff is "required to produce 'concrete evidence' of an agreement or 'meeting of the minds'" between Defendants Spencer and Hutton and the Abbate and Cassabon Defendants to violate Plaintiff's constitutional rights. *Radcliffe v. Rainbow Const. Co.,* 254 F.3d 772, 782 (9th Cir.), *cert. denied,* 534 U.S. 1020, 122 S.Ct. 545, 151 L.Ed.2d 423 (2001).

Plaintiff argues that Defendants are not entitled to summary judgment as to the alleged conspiracy:

The record ... shows that there was a preexisting and extensive personal relationship between the Abbates and defendant Spencer, consisting of personal, financial and political ties. The evidence also shows that Abbate defendants brought their claim to the District Attorney's Office through unconventional channels, instead of proceeding to the Merced Police Department. The evidence further shows that, contrary to common practice, the District Attorney did not utilize a forensic accountant or fraud examiner in the investigation stage but relied upon Abbate's misleading analysis with no scrutiny or even review. The evidence further shows that Hutton and Abbate worked together to obtain a misleading statement from Aceves as to Fenters' alleged embezzlement, failing to report or otherwise bring out the exculpatory fact that Fenters' involvement was suggested first by Abbate and that Aceves was 'lured in' to adopting this version. The evidence further shows that the prosecution took on the embezzlement case against Fenters without testing the facts or even knowing the magnitude of her alleged embez-

zlement, only after a brief meeting. The evidence also shows contact between the various principals during the course of the prosecution, as well as their extensive cooperation with a non-law enforcement and involved individual, Abbate himself, during the investigation stage.

In *Radcliffe, supra,* 254 F.3d at 783, the Ninth Circuit explained:

The plaintiff's point to Massini's subsequent zeal in prosecuting and her lack of research or discussion with her deputies who had dealt with the earlier cases, as evidence of conspiracy. The plaintiffs also suggest that one motive of Massini was to curry Richardson's support for Massini's upcoming re-election bid. But zealous prosecution, is not sufficient to raise a triable issue of conspiracy with the citizen complainant. A relationship of cause and effect between the complaint and the prosecution is not sufficient, or every citizen who complained to a prosecutor would find himself in a conspiracy. The plaintiffs must provide evidence of 'an agreement or meeting of the minds to violate constitutional rights.'

Plaintiff's argument that the prosecutor relied on Abbate's spreadsheet as evidence of conspiracy to prosecute Plaintiff without probable cause is unsupported. Abbate's spreadsheet was ruled inadmissible at the preliminary hearing. It was the Cassabon report that was admitted at trial. There is no evidence that Abbate and Hutton worked together to obtain a false statement from Aceves; Aceves' deposition testimony and the report of the interview of Aceves by Abbate and Hutton establish the contrary. Hutton's report to the prosecutor contained Hutton's report and the transcript of the meeting between Aceves, Abbate and Hutton, which shows that Aceves mentioned Plaintiff first, not Abbate. The fact that the District Attorney's

Office decided to investigate the claim of embezzlement after a brief meeting and without knowing the magnitude of the embezzlement means is not wrongful given that Aceves had told Abbate that Aceves had been embezzling from Yosemite Chevron and that Fenters had told him how to do it.

Summary judgment for Defendants is GRANTED as to Plaintiff's claim of conspiracy.

### F. THIRD CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CIVIL CODE § 52.1.[3]

The Third Cause of Action is pursuant to California Civil Code § 52.1 against the Abbate Defendants and the Cassabon Defendants and alleges in pertinent part:

> 45. The defendants' intentional and reckless acts, as described above, constitute a deprivation of plaintiff['s] ... rights, privileges and immunities under both article I of the California Constitution and the Fourth Amendment, specifically, her rights not to have her liberty restricted without legal basis, to be arrested without probable cause, and to be prosecuted maliciously without probable cause. The defendants' interference with these constitutional rights was accomplished by means of force, coercion, and intimidation, and/or the threat thereof. Plaintiff clarifies that the defendants' liability under this cause of action is not based on the privileged acts

of reporting criminal activity and/or testifying in court, but, rather, fabricating evidence used to justify the filing and continuation of baseless criminal charges, as set forth hereinabove.

Defendants move for summary judgment as to the Third Cause of Action on the grounds that the cause of action is barred by the statute of limitations; there is no evidence that Abbate threatened, intimidated or coerced Plaintiff; and the cause of action is barred by the litigation privilege set forth in Civil Code § 47(b).

#### 1. Statute of Limitations.

■ Defendants contend that the Third Cause of Action is barred by the one year statute of limitations applicable to Section 52.1, citing *Gatto v. County of Sonoma,* 98 Cal.App.4th 744, 120 Cal. Rptr.2d 550 (2002). In *Gatto,* the Court ruled:

> Gatto's complaint relies entirely on allegations of the denial of full and equal access to public accommodations guaranteed under section 51, subdivision (b) [of the Civil Code] and free speech guaranteed under article I, section 2 of the California Constitution, which Gatto seeks to enforce under section 52.1. As we have seen, the first claim clearly derives from common law principles and is for that reason subject to the one-year statute. The second is analogous to a federal claim for personal injury under 42 United States Code section 1983

---

**3.** California Civil Code § 52.1(b) provides that "[a]ny individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (b), may institute and prosecute ... a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of

the right or rights secured." Section 52.1(a) provides for an action by the Attorney General, district attorney or city attorney "[i]f a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual ... of rights secured by the Constitution or laws of the United States, or the rights secured by the Constitution or laws of this state ...."

which ... sounds in tort ... and this claim is therefore also subject to the one-year claim.

The July 14, 2006 Order re Defendants' motions to dismiss the Complaint, notes:

In their brief, these defendants refer to the "two-year" statute of limitations set forth in CCP § 340. However, Section 340 sets forth the one-year statute of limitations. Because *Gatto* also refers to the one-year statute of limitations applicable to actions under Section 1983 as being the limitations applicable to claims under Civil Code § 52.1, it is apparent that the reference in the brief to CCP § 340 is a typographical error. Effective January 1, 2003, California Code of Civil Procedure § 335.1 provides for a two-year statute of limitations for "an action for assault, battery, or injury to, or for the death of an individual caused by the wrongful act or neglect of another." For actions under 42 U.S.C. § 1983, the Ninth Circuit applies the forum state's statute of limitations for personal injury actions. *Jonas* [*Jones*] *v. Blanas,* 393 F.3d 918, 927 (9th Cir.2004). Therefore, the Abbate Defendants should have referred to the two-year statute of limitations set forth in CCP § 335.1.

Consequently, Defendants' contention that the Third Cause of Action is subject to a one-year statute of limitation based on *Gatto* has been rejected by the Court. Defendants' motion for summary judgment based on the bar of the statute of limitations is DENIED.

### 2. *Threats or Coercion.*

■ Defendants move for summary judgment on the ground that there is no evidence that Abbate threatened or coerced Plaintiff.

■ In *Jones v. Kmart Corp.,* 17 Cal.4th 329, 334, 70 Cal.Rptr.2d 844, 949 P.2d 941 (1998), the California Supreme

Court explained that "section 52.1 does require an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *See also Venegas v. County of Los Angeles,* 32 Cal.4th 820, 843, 11 Cal.Rptr.3d 692, 87 P.3d 1 (2004) ("the language of section 52.1 provides remedies for 'certain misconduct that interferes with' federal or state laws, if accompanied by threats, intimidation, or coercion, and whether or not state action is involved."). In *Venegas,* the California Supreme Court explained:

In *Jones v. Kmart Corp.* ..., we acknowledged that Civil Code section 52.1 was adopted 'to stem a tide of hate crimes.' But contrary to the County's position, our statement did not suggest that section 52.1 was limited to such crimes, or required plaintiffs to demonstrate that County or its officers had a discriminatory purpose in harassing them, that is, that they committed an actual hate crime. We continued in *Jones* by simply observing that the language of section 52.1 provides remedies for 'certain misconduct that interferes with' federal or state laws, if accompanied by threats, intimidation, or coercion, and whether or not state action is involved.

*Id.* at 843, 11 Cal.Rptr.3d 692, 87 P.3d 1. "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union School Dist.,* 149 Cal.App.4th 860, 883, 57 Cal. Rptr.3d 454 (2007).

*Kincaid v. City of Fresno,* 2008 WL 2038390 (E.D.Cal.2008), included a concession that the California Supreme Court

has not defined the terms "threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion." The Court referred to a decision by the Massachusetts Supreme Judicial Court, construing language in a statute that formed the model for the Bane Act:

[A] 'threat' consists of the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. 'Coercion' is the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.

*Haufler v. Zotos*, 446 Mass. 489, 845 N.E.2d 322, 335–336 (2006).

Plaintiff responds that there is evidence that Abbate coerced Aceves to give a statement implicating Plaintiff and that Aceves told the prosecutor that he felt pressured by Abbate in this regard. Plaintiff argues that evidence that Abbate misrepresented and "fabricated" evidence against Plaintiff raised the continuous prospect of her conviction and incarceration, which Plaintiff testified threatened her. Plaintiff cites *McCalden v. California Library Association*, 955 F.2d 1214 (9th Cir.1990), *cert. denied*, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992) as "finding a claim for a violation of California Civil Code § 51.7 sufficient, although it alleged non-contemporaneous intimidating conduct that was not even conveyed directly to the victim."

In *McCalden*, the Ninth Circuit addressed the district court's dismissal with prejudice of the claim by McCalden, a self-described "Holocaust revisionist", under California Civil Code § 51.7 on the ground that the complaint did not sufficiently allege intimidation by threat of violence committed to plaintiff's person or property as required by Section 51.7. Section

51.7(a), as amended in 1984, provided in relevant part:

All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute. The identification in this subdivision of particular bases of discrimination is illustrative only rather than restrictive.

The Ninth Circuit ruled:

Liberally construed, the complaint contains one allegation of a specific threat— the AJC's alleged statement to the CLA, 'at the urging and request and with the knowledge, approval and cooperation of Defendants Marvin Hier ... and Simon Wiesenthal Center' that if the contract with appellants were not canceled, "[d]efendant CLA's 1984 Annual Conference would be disrupted, there would be damage to property and the CLA would be 'wiped out.'" ... Appellees claim that this language can be construed only as a threat against the CLA, not against the person or property of appellant. They cite *Coon v. Joseph*, 192 Cal.App.3d 1269, 237 Cal.Rptr. 873 (1987), in which the court held that the plaintiff, a gay man, could not state a § 51.7 claim against a bus driver by alleging that his lover was verbally abused and struck in his presence. The court stated:

The complaint establishes that no violence or intimidation was committed or threatened against [plaintiff's] person and thus no cause of action exists in his own right. Following [plaintiff's] argument, any person would have the right to recover damages for himself or herself whenever the rights of any other human being of similar

... sexual orientation were threatened.

*Id.* at 1277–78, 237 Cal.Rptr. 873 ....

On a motion to dismiss, all reasonable inferences are to be drawn in favor of the non-moving party ... Appellant alleges that the appellees intended to disrupt his presentation by creating a demonstration that appellees knew and intended 'would create a reasonable probability of property damage and of violence against Plaintiff and members of Defendant CLA.' ... In view of all the facts pled, it is reasonable to infer that any property damage or injury threatened could be directed against appellant, because the allegations clearly link the alleged threat to an intent to disrupt appellant's exhibit and program. This case must therefore be distinguished from *Coon,* because it can be reasonably inferred from the complaint that the threatened violence was directed against appellant.

Although appellees suggest that the statute must be read as requiring the threat to be conveyed directly to the person threatened, the statute only requires that the plaintiff be intimidated by threat of violence committed against his person or property. In construing a remedial statute, on a motion to dismiss, in the absence of clear state court direction, this court is reluctant to read any unnecessary restrictions into § 51.7.

955 F.2d at 1221–1222.

Plaintiff argues that, because Section 52.1 does not require proof of animus against the plaintiff, "[i]t would therefore make little sense that the more general Bane Act would require a closer nexus between the perpetrator's threatening acts and the constitutional violation than does the Unruh Act." Contending that Section 52.1 is a more general statute that should be construed more broadly, Plaintiff argues:

[The] allegations that she was for the duration of the prosecution against her, subject to a legitimate threat of prosecution, i.e., a loss of liberty, her allegations under section 52.1 are sufficient. Indeed, the defendants by causing plaintiff's prosecution and raising the prospect of her imprisonment, committed acts that were inherently coercive and threatening.

Aceves' deposition testimony and the record of his interview with Abbate and Hutton establishes that Abbate did not coerce Aceves to give a statement implicating Plaintiff in the alleged embezzlement. However, there is evidence from which it may be inferred that Abbate did not give Hutton complete financial and other information during the course of his investigation. If the trier of fact determines that Abbate was pursuing the criminal prosecution to threaten and intimidate Plaintiff to deter her from bringing claims related to her employment, the case authority cited above permits an inference of conduct prohibited by Section 52.1. Summary judgment on this ground is DENIED.

### 3. *Civil Code § 47(b) Privilege.*

■ Defendants move for summary judgment as to the Third Cause of Action on the ground that Plaintiff's claim is barred by the litigation privilege set forth in California Civil Code § 47(b).

■ Section 47(b) bars a civil action for damages based on statements made in any judicial proceeding, in any official proceeding authorized by law, or in the initiation or course of any mandate-reviewable proceedings authorized by law. The litigation privilege provided in Section 47(b) applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.

*A.F. Brown Elec. Contractor, Inc. v. Rhino Elec.,* 137 Cal.App.4th 1118, 1126, 41 Cal.Rptr.3d 1 (2006). Section 47(b) establishes an absolute privilege for such statements and bars all tort causes of action based on them except a cause of action for malicious prosecution. *Hagberg v. California Federal Bank,* 32 Cal.4th 350, 360, 7 Cal.Rptr.3d 803, 81 P.3d 244 (2004). " 'Section 47 gives all persons the right to report crimes to the police, the local prosecutor or an appropriate regulatory agency, even if the report is made in bad faith.' " *Hagberg, id.* at 365, 7 Cal.Rptr.3d 803, 81 P.3d 244. " '[A] communication concerning possible wrongdoing, made to an official governmental agency such as a local police department, and which communication is designed to prompt action by that entity is as much a part of an "official proceeding" as a communication made after an official investigation has commenced ... After all, "[t]he policy underlying the privilege is to assure utmost freedom of communication between citizens and public authorities whose responsibility it is to investigate and remedy wrongdoing." ... The importance of providing to citizens free and open access to governmental agencies for the reporting of suspected criminal activity outweighs the occasional harm that might befall a defamed individual. Thus the absolute privilege is essential.' " *Id.* at 364–365, 7 Cal.Rptr.3d 803, 81 P.3d 244. Section 47(b)'s absolute privilege applies to "communications intended to instigate official investigation into [suspected] wrongdoing." *Id.* at 369, 7 Cal.Rptr.3d 803, 81 P.3d 244. Statements made to prompt an official investigation that may result in the initiation of judicial proceedings also fall within the privilege set forth in Section 47(b). *Id.* at 361–36, 7 Cal.Rptr.3d 803, 81 P.3d 244.

Plaintiff responds that, to the extent the Third Cause of Action alleges an unconstitutional malicious prosecution claim under Section 52.1, it is not barred by the Section 47(b) privilege. Plaintiff asserts that she "has found no case where a malicious prosecution claim and/or a section 52.1 claim based on malicious prosecution was dismissed based on an application of section 47(b)."

In *Hagberg,* the plaintiff filed a complaint alleging claims for false arrest, false imprisonment, slander, invasion of privacy, intentional infliction of emotional distress, and race discrimination in violation of the Unruh Civil Rights Act, Civil Code §§ 51 and 52.1. The Supreme Court refused to address the plaintiff's contention that Section 47(b) should not be interpreted to bar liability where it is alleged that a business establishment's communication to the police concerning suspected criminal activity was motivated by racial or ethnic prejudice and therefore constituted unlawful discrimination by the business establishment in violation of the Unruh Civil Rights Act, because the plaintiff's evidence did not suffice to raise a question of fact that defendants were motivated by racial or ethnic prejudice. 32 Cal.4th at 375–376, 7 Cal.Rptr.3d 803, 81 P.3d 244. No case since *Hagberg* discusses application of Section 47(b) to a claim for violation of Section 52.1.

Summary judgment on this ground is DENIED.

### G. *FOURTH CAUSE OF ACTION FOR MALICIOUS PROSECUTION.*

The Fourth Cause of Action is for malicious prosecution under California common law against the Abbate Defendants and the Cassabon Defendants and alleges in pertinent part:

49. The defendants' intentional and reckless acts, as described above, caused plaintiff ... to be maliciously prosecuted without probable cause or other legal basis. Plaintiff was acquitted at trial.

Plaintiff clarifies that the defendants' liability under this cause of action is not based on the privileged acts of reporting criminal activity and/or testifying in court, but, rather, fabricating evidence used to justify the filing and continuation of baseless criminal charges, as set forth hereinabove.

Defendants move for summary judgment as to the Fourth Cause of Action for malicious prosecution on the ground that the District Attorney's Office acted with independent discretion.

■ "To establish a cause of action for malicious prosecution, a plaintiff must demonstrate that the prior action (1) was initiated by or at the direction of the defendant and legally terminated in the plaintiff's favor, (2) was brought without probable cause, and (3) was initiated with malice." *Siebel v. Mittlesteadt,* 41 Cal.4th 735, 740, 62 Cal.Rptr.3d 155, 161 P.3d 527 (2007).

Defendants cite *Hogen v. Valley Hospital,* 147 Cal.App.3d 119, 195 Cal.Rptr. 5 (1983). In *Hogen,* a doctor brought a malicious prosecution action against certain hospitals and another doctor in which it was alleged that defendants had filed a false report with the Board of Medical Quality Assurance, which resulted in the filing of charges against plaintiff. At the conclusion of the hearing before the Board of Medical Quality Assurance, it was found that no cause existed for the suspension or revocation of plaintiff's medical certificate. The trial court sustained without leave to amend a demurrer to plaintiff's complaint on the grounds that the communication from the hospitals were absolutely privileged under Section 47, that the Board had discretion to determine whether to file charges against plaintiff, and thus defendants were not responsible for the Board's ultimate decision to bring charges. The Court of Appeal affirmed, holding that although defendants would have been afforded absolute protection under Section 47 for an action for libel or slander, no such absolute privilege is afforded with respect to an action for malicious prosecution. The Court held that the trial court properly sustained the demurrer on the ground that the Board had conducted an independent investigation and determination prior to proceeding on the complaint, that it was the board, not defendants who initiated or procured the disciplinary proceedings against the plaintiff, and therefore plaintiff failed to allege the elements required to establish an action for malicious prosecution:

> The BMQA is similar to the State Bar Association. Each is empowered and directed to conduct an independent investigation of all complaints from the public prior to the filing of an accusation. (Bus. & Prof.Code, § 2200; Gov. Code, §§ 11500–11528). As a consequence, we are persuaded by the reasoning of *Stanwyck* and *Werner [v. Hearst Publications, Inc.,* 65 Cal.App.2d 667, 151 P.2d 308 (1944)] that inasmuch as the BMQA conducted an independent investigation and determined prior to proceeding on the complaint, it was the BMQA, not respondents, who initiated or procured the disciplinary proceedings against appellant. Therefore, appellant failed to allege the elements required to establish an action for malicious prosecution.

*Johnson v. Superior Court,* 25 Cal.App.4th 1564, 31 Cal.Rptr.2d 199 (1994). In *Johnson,* a psychologist sued expert consultants for malicious prosecution in connection with disciplinary proceedings by the California Board of Psychology and Board of Behavioral Science Examiners against plaintiff. The Court of Appeal affirmed that plaintiff did not state a claim for malicious prosecution because it was the Boards, not the expert consultants, who filed the disciplinary proceedings against

the plaintiff. *Id.* at 1571, 31 Cal.Rptr.2d 199. *See also Stanwyck v. Horne,* 146 Cal.App.3d 450, 452, 194 Cal.Rptr. 228 (1983) (independent investigation by State Bar presumed).

Plaintiff argues that the evidence is disputed whether the District Attorney's Office conducted an independent investigation, contending that there is evidence that Abbate influenced the investigation by "making contrived allegations of embezzlement against Fenters which he bolstered with a fabricated, misleading spreadsheet and a coerced statement from Aceves." Plaintiff asserts that there is evidence that Abbate "withheld crucial information pertaining to how many employees used the register on a given shift and Robert Wilson's being fired for stealing from Fenters."

Aceves' deposition testimony establishes that Aceves was not coerced by Abbate to make the statements he made to Abbate and Hutton. However, there is evidence from which it may be inferred that Abbate did not provide the described evidence to Hutton. Summary judgment as to the Fourth Cause of Action is DENIED.

### H. *FIFTH CAUSE OF ACTION FOR VIOLATION OF 29 U.S.C. §§ 201 et seq.*

■ The Fifth Cause of Action is alleged against the Abbate Defendants pursuant to 29 U.S.C. § 201 *et seq.*:

52. By refusing to pay plaintiff … overtime and other compensation to which she was clearly entitled, the defendants have denied her wages that she earned during her employment. The defendants are subject to the terms of this statute, as they are engaged interstate commerce.

53. The foregoing actions are in violation of 29 U.S.C. § 201, *et seq.,* and dictate that the defendants are liable to the plaintiff. Moreover, the defendants'

violation of plaintiff's federal overtime and compensation rights was willful and thus entitles her to additional liquidated damages.

Defendants move for summary judgment as to Plaintiff's claim that "[b]y refusing to pay plaintiff … overtime and other compensation to which she was clearly entitled, the defendants have denied her wages that she earned during her employment" in violation of 29 U.S.C. § 201 *et seq.*

Defendants refer to Plaintiff's deposition testimony that Fenters has no evidence to show that Yosemite Chevron's timecards are inaccurate; that she could not identify any specific date that she was not paid for overtime; that she could not identify any specific hour of overtime that she has not been paid for by Yosemite Chevron; and her testimony that there could be zero hours of overtime that have been unpaid. In addition, Defendants refer to evidence that Yosemite Chevron paid all required overtime under the laws of California based on the time cards submitted by Plaintiff.

Plaintiff argues that summary judgment is not appropriate because she testified at her deposition that she was not paid time and a half for overtime, even if she could not at her deposition provide a calculation as to that time.

■ An employee seeking to recover unpaid minimum wages or overtime under the FLSA "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) In view of the remedial purposes of the FLSA and the employer's statutory obligation "to keep proper records of wages, hours and other conditions and practices of employment," this burden is not to be "an impossible hurdle for the employee." *Id.*

If an employee establishes that overtime hours and wages were not recorded by the employer as required by the FLSA, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of a just and reasonable inference." *Id.* The burden then shifts to the employer to show the precise number of hours worked or to present evidence sufficient to negate "the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 688, 66 S.Ct. 1187. If the employer fails to make such a showing, the court "may then award damages to the employee, even though the result be only approximate." *Id.*

Summary judgment is GRANTED as to the Fifth Cause of Action. Plaintiff's conclusory deposition testimony that she was not paid overtime and the absence of evidence that Yosemite Chevron's timecards are inaccurate fail to make a prima facie case. She has no evidence as to dates or times proving that she worked any uncompensated overtime hours as a matter of reasonable inference. She testified at her deposition that the there could be zero hours of overtime that have been unpaid.[4]

## I. *SIXTH CAUSE OF ACTION FOR VIOLATION OF 29 U.S.C. § 215.*

■ The Sixth Cause of Action is against the Abbate Defendants for violation of 29 U.S.C. § 215 *et seq.*:

55. By retaliating against plaintiff . . . for her complaining about the denial of her compensation and overtime rights, the defendants have violated the anti-retaliation provision of the Fair Labor Standards Act, 29 U.S.C. §§ 215, 219. The defendants are subject to the terms of this statute, as they are engaged in interstate commerce.

56. There was no valid, good faith basis to retaliate against the plaintiff, and her engaging in activity protected by the Fair Labor Standards Act was a motivating factor in their retaliation. Plaintiff was in all respects qualified for her position and was performing well.

Defendants move for summary judgment as to the Sixth Cause of Action. 29 U.S.C. § 215(a)(3) provides that it is unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted in any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding . . . ."[5]

■ Defendants move for summary judgment on the ground that Plaintiff failed to exhaust administrative remedies before bringing this cause of action.

*Lambert v. Ackerley,* 180 F.3d 997, 1002–1008 (9th Cir.1999), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000), rejected the position that the anti-retaliation provision of Section 215(a)(3) extends only to those employees who filed formal proceedings with the Department of Labor, holding that "§ 215(a)(3) protects from retaliation employees who com-

---

4. This ruling makes unnecessary Defendants' alternative ground for summary judgment based on the statute of limitations.

5. Plaintiff asserts that she complained to Abbate about sexual harassment by another employee. This is not alleged in the Sixth Cause of Action. Further, no legal authority has been discovered that allows a Section 215 claim of retaliation based on a complaint of sexual harassment; such a claim is covered by Title VII. Plaintiff cannot proceed under the Sixth Cause of Action for her assertion that she complained to Abbate about the sexual harassment by Montes.

plain to their employer about alleged violations of the Act."

Defendants' motion for summary judgment on this ground is DENIED.

As explained in *Wolf v. Coca–Cola Co.,* 200 F.3d 1337, 1342–1343 (11th Cir.2000):

A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: '(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.' ... If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext ... In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights.

Defendants argue that Plaintiff has no evidence that she "subsequently suffered an adverse action" by Yosemite Chevron after allegedly making complaints to Abbate about wage and overtime issues. Defendants note that Plaintiff resigned her employment at Yosemite Chevron on March 28, 2003.

In *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir.2000), a case involving Title VII, the Ninth Circuit held that "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."[6]

Defendants argue that Plaintiff offers no legal authority to support her claim that reporting a suspected crime to law enforcement constitutes an adverse employment action, especially when Plaintiff had already resigned before the suspected criminal conduct was reported.

Plaintiff cites *E.E.O.C. v. Nalbandian Sales, Inc.,* 36 F.Supp.2d 1206, 1211 (E.D.Cal.1998), a case involving Title VII, as supporting the conclusion that evidence Plaintiff resigned because her complaints to Abbate about wage and hour, overtime, reimbursement and sexual harassment issues and then was wrongly prosecuted for embezzlement based on allegedly false and fabricated evidence is sufficient to state a claim for relief under Section 215.

In *Nalbandian Sales,* the plaintiff alleged that a former employer refused to rehire the employee in retaliation for a

6. In *Vasquez v. County of Los Angeles,* 307 F.3d 884, 891 (9th Cir.2002), held that "the proper inquiry is to view the action objectively to determine whether it was adverse" and that "a purely subjective analysis is not appropriate when deciding whether an employment action was adverse." However, the 2002 *Vasquez* opinion was withdrawn and superceded by *Vasquez v. County of Los Angeles,* 349 F.3d 634, 646 (9th Cir.2003). The Ninth Circuit, discussing the prima facie case analysis, stated:

This analysis requires us to examine separately whether the 'adverse employment action' is considered through an objective or subjective lens. We addressed this question, at least in passing, in *Ray v. Henderson.* We adopted the EEOC standard from its compliance manual, and held that 'an action is cognizable as an adverse employment action if it is reasonably likely

to deter employees from engaging in protected activity.' In context, this is, at least in part, a subjective standard because the EEOC manual speaks of " 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter *the charging party* or others from engaging in protected activity.' " ....

Including behavior of the charging party in the standard removes it from the hypothetical 'reasonable employee' approach and makes it more subjective. Of course, it is not entirely subjective as the conduct must be 'reasonably likely' to deter the protected activity, even by the charging party.

For purposes of analysis, we will assume that the transfer met the *Ray* standard. However, this does not save Vasquez's retaliation claim because he has failed to show a causal link.

discrimination claim filed by the employee's sister. The Court ruled that "this court exercises authority to broadly interpret federal remedial legislation in order to effectuate the statute's overarching purposes. The majority of courts, including the Supreme Court 'have been willing to construe Title VII and companion provisions under the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) ... broadly in order not to frustrate the purposes of these Acts, which is to prevent fear of economic retaliation from inducing employees "quietly to accept [unlawful] conditions." ' " 36 F.Supp.2d at 1211.

Summary judgment for Defendants on the Sixth Cause of Action is GRANTED; there is no evidence from which it may be inferred that the Abbate Defendants filed a criminal complaint against Plaintiff based on her alleged complaints concerning wage and hour, overtime, and reimbursement issues. Plaintiff had already resigned her employment before the alleged embezzlement was discovered.

## CONCLUSION

For the reasons stated:

1. Defendants Yosemite Chevron, Abbco Investments, LLC, and Robert Abbate's motion for summary judgment is GRANTED IN PART AND DENIED IN PART;

2. Counsel for the Abbate Defendants shall prepare and lodge a form of order that the rulings set forth in this Memorandum Decision within five (5) days following the date of service of this decision;

3. Consistent with Rule 56(d)(1), both parties shall have five (5) days following service of this decision to file a list of material facts which each party believes are not genuinely issues for purposes of trial. If separately filed by the parties, these lists shall not exceed five pages. To the extent practicable, the parties shall meet and confer to determine whether and to what extent any material facts are agreed upon for purposes of trial. Agreed upon facts should be listed in a joint filing.

IT IS SO ORDERED.

ORDER DENYING DEFENDANTS' EX PARTE APPLICATION TO SHORTEN TIME FOR HEARING ON AND DENIAL OF DEFENDANTS' MOTION FOR CERTIFICATION OF ORDER FOR APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

Defendants, Yosemite Chevron, Abbco Investments, LLC and Robert Abbate ("Defendants") seek an ex parte application for order shortening time to hear their motion to certify for immediate appeal the Court's December 30, 2010 Order Denying Summary Judgment pursuant to 28 U.S.C. § 1292(b). No oral argument is necessary and the matter is submitted for decision.

This case, brought by Tiffany Fenters, a former employee of the Abbate Defendants, alleges claims for violation of her civil rights and other damages arising from the alleged wrongful termination of her employment, abusive employment practices, and accusations of criminal wrongdoing against her made by the Abbate Defendants, leading to a criminal prosecution of Fenters, which resulted in her acquittal.

Defendants have suggested that the denial of their summary judgment motion was erroneous based on their contention that as private parties they could not have conspired or acted in concert with public officials and other state actors in the Merced County District Attorney's Office and related law enforcement agencies.

A. *Required Legal Standard.*

■ Defendants seek certification of the Court's decision granting in part and denying in part Defendants' Motion for Summary Judgment, an interlocutory or-

der from which no appeal is available until the entry of final judgment following trial on the merits. *Hopkins v. City of Sierra Vista, Ariz.*, 931 F.2d 524, 529 (9th Cir. 1991). The standard for a permissive interlocutory appeal requires that a district court find and certify that its order: 1) involves a controlling question of law; 2) as to which there is substantial ground for difference of opinion; and 3) an immediate appeal may materially advance ultimate termination of the litigation.

■■■ In the Ninth Circuit, § 1292(b) is to be applied sparingly and only in exceptional cases. The "controlling question of law" requirement must be interpreted in such a way as to implement this policy. *In re Cement Antitrust Litigation*, 673 F.2d 1020, 1027 (9th Cir.1982); *Davis Moreno Construction, Inc. v. Frontier Steel Buildings Corp.*, 2011 WL 347127 (E.D.Cal. Feb.2, 2011). A party seeking interlocutory review "has the burden of persuading the Court of Appeals that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). The standard to certify a question of law is high and a district court generally should not permit such an appeal where "it would prolong litigation rather than advance its resolution." *Syufy Enter. v. Am. Multi Cinema, Inc.*, 694 F.Supp. 725, 729 (M.D.Cal.1988). In applying these standards, the trial court must weigh the asserted need for the proposed interlocutory appeal with the policy in the ordinary case of discouraging piecemeal appeals. *Association of Irritated Residents v. Fred Schakel Dairy*, 634 F.Supp.2d 1081, 1087 (E.D.Cal.2008).

■■■ To establish a "substantial ground for difference of opinion," a showing that there is a dearth of case law, or that the issue is a question of first impression is insufficient. *Davis Moreno*, 2011 WL 347127 at **2–3. The Court should also consider: 1) if there are other claims (even ones of state law) for which trial would nonetheless be required; 2) whether trial is imminent; 3) whether the trial promises to be lengthy or complex; and 4) how long the litigation has been pending. *Id.* at **3–4.

■■■ This case has been pending since 2005. It is now approximately six years old. The summary judgment ruling now sought to be appealed was entered December 30, 2010. The present motion filed 78 days later seeks to avoid an imminent June 14, 2011 trial date, previously scheduled with the agreement of the parties in January 2011. This delay alone is sufficient to deny certification. *Falise v. American Tobacco Co.*, 94 F.Supp.2d 316, 357 (E.D.N.Y.2000) (denying certification motion two and one-half months before the scheduled trial and holding, "[T]o delay proceedings for appellate review on the eve of trial would not advance the ends of justice, and would unnecessarily burden both this Court and the Court of Appeals."). The party seeking certification must act with "diligence." *Jiddes Richardson Electronics, Ltd. v. Panache Broadcasting of Pennsylvania, Inc.*, 202 F.3d 957, 958–59 (7th Cir.2000) (two month delay in filing for certification was untimely); *Weir v. Propst*, 915 F.2d 283, 285–87 (7th Cir.1990) (sixty-three days between interlocutory order and certification motion justified denial on the grounds of lack of timeliness); *see also Giddes v. Glens Falls Ins. Co.*, 2003 WL 23486911, *1 (M.D.Fla.2003).

■■■ There are other claims advanced by Plaintiff. The trial will not be lengthy (approximately eight days). The trial will not be complex as the issues turn almost entirely on the credibility of witnesses. The motion lacks diligence, is untimely,

and simply seeks to avoid trial in this case. This lack of diligence justifies denial of a motion.

## B. *Merits of the Motion.*

 *Arguendo,* the Defendants argue that a claim cannot be maintained under the Civil Rights Act, 42 U.S.C. § 1983 solely against a private actor. The Court has addressed the issue on pages 57–75 of the underlying decision denying summary judgment. Under the authority of *Arnold v. IBM Corp.,* 637 F.2d 1350, 1356–57 (9th Cir.1981), a civil rights plaintiff can establish the requisite causation between the conduct of private persons and a violation of § 1983 by proving that private individuals exercise control over the decision-making state law enforcement in an investigation. (Cited with approval and followed in *Franklin v. Fox,* 312 F.3d 423, 445–446). Defendants' argument that the dismissal of governmental co-defendants ends the ability to maintain the claim against the private defendants is belied by the *Arnold* case, 637 F.2d at 1352, where the plaintiff did not sue any governmental defendants.

Defendant Abbate, an individual, actively participated in the District Attorney's investigation working with the team assigned to the Fenters' criminal investigation and prosecution. District Attorney Investigator Hutton acknowledged that Defendant Abbate assisted the District Attorney's investigation in the Fenters' matter between May 14 and June 4, 2003. Defendant Abbate acknowledged he assisted with the investigation and had his most extensive contacts with Investigator Hutton during the District Attorney's investigative phase of the criminal case.

Investigator Hutton testified about an interview protocol set up between Defendant Abbate and Hutton to conduct the June 4, 2003 interview of a co-employee of Fenters. Abbate also set up the June 4, 2003 interview with his employee, Acevas. Abbate himself conducted the first part of the District Attorney's interview, in conformity with guidelines provided by Investigator Hutton. Abbate also provided an additional eight months of financial analysis to assist the District Attorney. Investigator Hutton spent approximately 20 hours working on the Fenters case. Defendant Abbate worked 35 hours on the investigation, not including time he spent assisting Hutton in interviews of witnesses.

Mr. Bassarini, lead prosecutor at the preliminary hearing and trial of the case against Fenters, had frequent contact with Defendant Abbate as did Investigator Hutton, to prepare for the preliminary hearing and present the trial. This extensive involvement and participation coupled with the alleged motive of Abbate as employer and owner of the service station, Yosemite Chevron, where Plaintiff was employed, to avoid sexual harassment charges and allegations of other deprivations of Plaintiffs' employment interests present disputed issues of material fact whether they were joint participants in a concerted action to violate Plaintiffs' constitutional rights and had some control over the state officials' decision, that cannot be resolved as a matter of law. Abbate also benefitted from the criminal prosecution which he aided by diverting Fenter's pursuit of her claims and his efforts to discredit her.

The Abbate Defendants raise an argument not presented in their Summary Judgment Motion and not addressed by the Court's Memorandum Decision concerning a malicious prosecution claim under § 1983. An issue not raised in the trial court has been waived for failure to raise it in the District Court. *Alameda Books, Inc. v. City of Los Angeles,* 631 F.3d 1031, 1044 (9th Cir.2011).

Plaintiff's First Amended Complaint alleged that the Abbate Defendants initiated their actions to cause her to be falsely prosecuted as a "preemptive strike" to defeat her from successfully pursuing any remedies for violation of her rights in the work place. ¶ 23, Doc. 66, p. 8–9. Plaintiff alleges there was no probable cause for her prosecution, that it was meritless, and Defendants pursued it for the improper motive of attempting to defeat Plaintiff's claims. The Abbate Defendants' did not challenge this claim by their prior motion to dismiss the First Amended Complaint nor in Abbate Defendants' Summary Judgment Motion. *See* Docs. No. 78, 131. Under applicable U.S. Supreme Court precedent, a prosecution instituted without probable cause and intended to discourage a plaintiff from seeking redress for grievances violates the Fourth and First Amendments to the United States Constitution. *Hartman v. Moore*, 547 U.S. 250, 256, 261–62, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006); *Beck v. City of Upland*, 527 F.3d 853, 864–67, 871 (9th Cir.2008). The Abbates' citations of legal authority, to support their argument that the law is unsettled, pre-date these Supreme Court and Ninth Circuit more recent cases.

The last argument raised by the Abbate Defendants is that it was error to find a genuine issue of material fact whether or not the Abbate Defendants' conduct amounted to a "threat by means of force, intimidation and coercion" under Federal and/or State law. This is no more than a re-argument and disagreement with the Court's prior review of applicable case law that the Defendants' conduct is sufficient to meet the threats of force, intimidation and coercion requirement of the law.

### CONCLUSION

For all the reasons stated above, because the trial date is imminent, there is no just cause for Defendants' lack of dili-

gence. Because Defendants seek an appeal from the entire case to prevent a trial, there is no just reason to certify this case for interlocutory appeal. There is nothing exceptional about the circumstances of this case. Defendants' Motion for Certification of Order for Appeal Pursuant to 28 U.S.C. § 1292(b) is DENIED.

IT IS SO ORDERED.